**FILED**

**APRIL 14, 2010**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| **STEPHANIE HAWKINS, DARSEMIA JACKSON and MERIJA WALLACE Individually, and on Behalf of All Others Similarly Situated,** | ) ) ) ) | |
| | ) | **Hon. Joan B. Gottschall** |
| **Plaintiffs,** | ) | |
| | ) | **Magistrate Judge Maria Valdez** |
| **v.** | ) | |
| | ) | **Case No. 09 C 3633** |
| **SECURITAS SECURITY SERVICES, USA INC.,** | ) ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

STEPHAN ZOURAS, LLP
Ryan F. Stephan
James B. Zouras
205 N. Michigan Avenue
Suite 2560
Chicago, Illinois 60601
312-233-1550

MILLER LAW, LLC
Marvin A. Miller
Matthew E. Van Tine
115 S. LaSalle Street
Suite 2910
Chicago, IL 60603
312-332-3400

LAW OFFICES of THOMAS M. RYAN
Thomas M. Ryan
35 E. Wacker Drive
Suite 650
Chicago, IL 60601
312-726-3400

i

**Table of Contents**

I. INTRODUCTION ......................................................................................... 1

II. DEFINITION OF THE CLASS ................................................................. 5

III. LEGAL STANDARD ............................................................................... 5

IV. FACTUAL BACKGROUND .................................................................. 7

V. ARGUMENT ............................................................................................ 14

    A. Rule 23(a)(1) - The Class is So Numerous Joinder is Impracticable ........ 14

    B. Rule 23(a)(2): There Are Questions of Law or Fact Common to the Class ........................................................................................ 14

    C. Rule 23(a)(3): The Claims or Defenses of The Representative Plaintiffs Are Typical of The Claims or Defenses of Class Members ...................... 17

    D. Rule 23(a)(4): The Representative Plaintiffs Will Fairly And Adequately Represent the Class ................................................. 19

    E. The Requirements of Rule 23(b) Are Satisfied ........................................... 20

        1) Rule 23(b)(1): There are Risks of Incompatible Standards of Conduct and Inconsistent Adjudications of Plaintiffs' Claims if They are Not Decided In a Single Trial ............................................. 21

        2) Rule 23(b)(3): Common Questions of Law and Fact Predominate and a Class is Superior to Joinder of Claims or Hundreds of Lawsuits ......................................................................... 23

            a. Common Questions Predominate ........................................... 23

            b. Plaintiffs Have A Common Method For Calculating Damages ........................................................................ 27

            c. Calculating Individual Damages Does Not Create an Individual Issue That Might Defeat Certification ................. 32

            d. A Class Action is the Superior Method of Adjudicating These Claims ........................................................ 33

    VI. CONCLUSION ........................................................................................ 34

## Table of Authorities

**Cases**

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .......................................................... 5,22

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ..................................... 1,4,29

*Baby Neal v. Casey*, 43 F.3d 48 (3rd Cir. 1994) ................................................................ 14

*Barragan v. Evanger's Dog and Cat Food Co., Inc.,* 259 F.R.D. 330 (N.D. Ill. 2009) ... 18

*Belbis v. Warren,* 2002 U.S. Dist. LEXIS 22426 (N.D. Ill. Nov. 18, 2002)................ 14,26

*Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290 (5th Cir. 2001)............................. 32

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)................................................................ 32

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ...................................................... 23

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) .................................................. 32

*Bouaphakeo v. Tyson Foods, Inc.,* 564 F. Supp. 2d 870 (N.D. Iowa 2008) ................. 15,25

*Brzychnalski v. Unesco, Inc.*, 35 F. Supp. 2d 351 (S.D.N.Y. 1999) .................................. 26

*Cf. International Bhd. of Teamsters v. United States,* 431 US 324 (1977)........................ 17

*Chavez v. IBP, Inc.*, 2002 WL 31662302 (E.D. Wash. Oct. 28, 2002)......................... 15,18

*DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171 (8th Cir.1995) ......................................... 15,17

*Dukes v. Wal-Mart*, 474 F.3d 1214 (9th Cir. 2007) ........................................................... 13

*Egge v. Healthspan Services Co.*, 208 F.R.D. 265 (D. Minn. 2002) ................................. 14

*Farmer, et al v. DirectSat, USA, LLC*, 08-CV-3962 (N.D.Ill. St. Eve, J.) ....................... 26

*Fletcher v. ZLB Behring LLC*, 2006 U.S. Dist. LEXIS 94838 (N.D. Ill., October 23, 2006) ..................................................................................................................................... 14

*Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (5th Cir. 1993) ............................................. 14

*General Telephone Co. v. EEOC,* 446 U. S. 318 (1980) .................................................... 18

*Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir. 1970)............................. 32

*Gutierrez v. Kovecavich "5" Farms*, 2004 WL 3745224 (E.D. Cal. 2004) .................... 26

*Howard et al v. Securitas,* 08-C-2746 (N.D. Ill. Gottschall) ....................................... 14,21

*Humphrey v. International Paper*, 2003 WL 22111093 (N.D. Ill. 2003) ........................... 6

*IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005) ........................................................................ 26

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009) ...................................................................................................................... 6

*In re FedEx Ground Package System, Inc., Employment Practices Litig.*, 2007 WL 3027405 (N.D. Ind. Oct. 15, 2007) .............................................................................. 32

*In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727 (N.D. Ill. 1977) ............................ 33

*In re Initial Public Offerings Sec. Litig.* ("*IPO*"), 471 F.3d 24, 41-42 (2d Cir. 2006) ....... 6

*Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983) .................................................. 25

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2004 WL 1882449 (N.D. Ill. Aug. 18, 2004) .......................................................................................................................... 4,26

*Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 675 (S.D. Fla. 1997) ................................... 25

*Leyva v. Buley*, 125 F.R.D. 512, 518 (E.D. Wash. 1989) ................................................. 26

*Liles v. American Corrective Counseling Services*, 231 F.R.D. 565 (S.D. Iowa 2005) ............................................................................................................................ 24,32

*Lockwood Motors Inc. v. General Motors Corp.*, 162 F.R.D569, 574 (D. Minn. 1995) ...................................................................................................................................... 14,26

*Lopez v. Tyson Foods*, 2008 WL 3485289 (D. Neb. Aug. 7, 2008) ........................... 21,22

*Lowers v. United States*, 2001 WL 200869 (S.D. Iowa May 2, 2001) ........................ 14,17

*McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988) ............................................... 26

*Mendez v. Radec Corp.*, 232 F.R.D. 78, 91 (W.D.N.Y. 2005) .................................... 15,18

*Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620 (5th Cir. 1999) ................... 17,24

*Payton v. County of Carroll*, 473 F.3d 845 (7th Cir. 2007) ...................................……7

*Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982) ...................................... 14

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) .................................... 14

*Powell v. National Football League*, 711 F. Supp. 959, 969 (D. Minn. 1989) ............... 21

*Reynolds v. National Football League*, 584 F.2d 280, 283-84 (8th Cir. 1978) ............... 21

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) …………………………………………..7

*Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993) …………..7

*Robinson v. Sears, Roebuck & Co.,* 111 F. Supp.2d 1101, 1120 (E.D. Ark. 2000).......... 15

*Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)................................................. 17

*Ruiz v. Stewart Assoc.*, 171 F.R.D. 238, 242 (N.D. Ill. 1997) .......................................... 17

*Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337 (Mass. 2008)......................................... 16

*Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 392 (W.D.N.Y. 2005)................................... 19

*Spoerle v. Kraft Foods Global, Inc.*, 2008 WL 2002221 (W.D. Wis. May 6, 2008)... 26,32

*Szabo v. Bridgeport Machs. Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001), *cert. denied*, 534 U.S. 951 (2001).................................................................................................................. 6,7

*Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386 (E.D. Pa. 2001)........................ 21

*Torres v. Gristede's Operating Corp.*, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ................................................................................................................. 15,26

*Tremble v. Ocean Bank*, 2006 U.S. Dist. LEXIS 93595 (N.D. Ill., March 21, 2006) ...... 14

*U.S. Dept. of Labor v. Cole Enterprises, Inc.,* 62 F.3d 775 (6th Cir. 1995) ..................... 26

*Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234-35 (9th Cir.1996).............................. 32

*Velez v. Majik Cleaning Service, Inc.*, 2005 WL 106895 (S.D.N.Y. Jan. 19, 2005) ........ 26

*VISA Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2nd Cir. 2001)................... 32,33

*Walton v. Franklin Collection Agency, Inc.*, 190 F.R.D. 404 (N.D. Miss. 2000)............. 32

*Wang*, 231 F.R.D. 602 (C.D. Cal. 2005)...................................................................... 18,26

*Weeks v. Bareco Oil Co.*, 125 F.2d 84 (7th Cir. 1941) ..................................................... 33

*Wenthold, et al. v. AT&T Technologies, Inc.,* 142 Ill. App.3d 612 (1st Dist. 1986) ......... 18

**Rules/Statutes**

F.R.C.P., Rule 23(b)........................................................................................... 5,20,21,23

Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.,* ("IMWL") ............................. 4,27

*Workers' Comp.*, 130 F.R.D. ........................................................................................... 33

**Treatises**

Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS, §7.24 .......14,15,18,33

WRIGHT & MILLER §1788 ............................................................................................... 24

# I. INTRODUCTION

On May 29, 2009, Plaintiffs filed their class action complaint requesting relief on behalf of themselves and all hourly paid, non-exempt security officers who, at any time during the relevant statute of limitations period (referenced herein as the "class period"), were employed by Defendant and not paid for all the time they worked as required by law. On or about October 27, 2009, this case was consolidated with *Howard et al v. Securitas, Case No.* 08 C 2746 for purposes of discovery pursuant to Local Rule 40.4. (*See* Doc. No. 259).

Plaintiffs have developed an overwhelming record of evidence supporting class certification. Defendant's own documents coupled with Defendant's sworn testimony[1] and sworn declarations,[2] confirm Plaintiffs' class is an ideal one for Rule 23 certification. Securitas' liability to Plaintiffs and the class can be established by common proof in one trial and damages can be ascertained using the same statutory formula. The only question that might remain is the measure of damages owed each class member.[3]

---

[1] Throughout this brief, Plaintiffs cite to the deposition testimony of Defendant's Vice President of Human Resources, Laura Rysavy. Ms. Rysavy is Defendant's designated Rule 30(b)(6) expert on: 1) security officer compensation; 2) Defendant's timekeeping methods; 3) security officer job description and duties; 4) Defendant's efforts to comply with wage and hour laws; 5) security officer training; and, 6) Defendant's dress code and appearance policies and practices.

[2] Plaintiffs have obtained declarations from **over 30** of Defendant's supervisors who confirm that Plaintiffs' were subject to the same policies, practices and schemes by the Defendant to deprive them of their hard earned wages. (*See* Group Ex. A).

[3] This difference does not preclude class certification. *See, e.g., Anderson v. Mt. Clemens*, 328 U.S. 680, 688 (1946) ("Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'") (quotation omitted).

Securitas is one of the world's largest corporations and the largest guarded security corporation in the United States. Securitas has streamlined the way in which it hires and trains employees, outfits officers in Securitas' uniforms, oversees their work and compensates them. Securitas has implemented standardized policies, time keeping practices and pay rates for the class members in this case.[4] Securitas' corporate culture of uniformity and standardization provides a solid foundation for certification in this case.

Unfortunately, Securitas implemented a similar systematic scheme to deprive several thousand class members of their hard earned wages. Throughout the class period, Defendant systematically required, encouraged and/or permitted its officers to work substantial time in addition to those officers' scheduled time, but only paid its officers for the scheduled time. To avoid having any record that officers worked time in addition to scheduled time, Defendant didn't use a time clock.[6] Indeed, Securitas often completed hand written time sheets before the security officer had finished working.[7]

Defendant implemented such a scheme to avoid un-billable payroll expenses for things such as orientation, ACT training, uniform maintenance[8] and pre and post-shift

---

[4] Notably, Securitas provides all of its officers with the same handbook which includes one set of policies and procedures all officers are required to follow. (*See* Ex. B at 119). Securitas uses the same automated system, known as Securitas Automated Field Enterprise System ("SAFES"), to record security officer schedules, time worked, compensation and other information in the same way. (*See* Ex. C - SAFES Manual at SUSA 003572; *See* Ex. B at 76).

[6] *See* Ex. E at 67; 114-115; 118; 156-157; 250-251. *See* Ex. Z - Sykes Dep. at 21; 54; and 58.

[7] *See* Ex. E at 122-129;Ex. Z at 99.

[8] This claim alone requires certification. There is no dispute that: all class members wore similar Securitas' uniforms; Securitas' written policy requires class members to wash and maintain these uniforms in an unwrinkled condition on their own time; Securitas enforces its policies with the threat of discipline; Securitas' derives a benefit from class members who perform work washing and ironing their uniforms; and, Securitas refuses to pay class members for this time worked. (*See* Infra Section IV below; Exhibit W – Defendant's HEROES Manual "The Office" at page SUSA 027217 which states:

work that it could not bill its clients. Defendant's objective to avoid un-billable time was so strong that it developed a 62 page manual entitled "Reducing Unbilled Payroll Expenses" that instructs Securitas' Branch Managers and Schedulers ████████ ████████████████████████ (*See* Ex. AA at SUSA 026791-026853 at SUSA 026833). Securitas Branch Manager Tim Brown testified that it was "critical" for the actual time recorded on security office time sheets to match the scheduled time because customers such as the CTA do not pay for any time actually worked by Securitas officers that was not scheduled. (*See* Ex. E at 85-87). In other words, if security officers work additional un-billable time, Securitas, not the client, will have to pay for it. As a result, Securitas went to great lengths to avoid recording un-billable time and un-billable overtime (i.e. time worked by security officers that it cannot bill its clients) because it negatively affects Securitas' profits. (*See* Ex. B at 46-49; 101-102; 304; *See* Ex. AA).

Securitas' own witnesses and documents confirm that it strictly adhered to its scheme of paying employees for scheduled billable time only. In fact, Defendant's timekeeper for its largest Illinois client, the Chicago Transit Authority ("CTA"), testified that 99% of the security officer scheduled start and end times mirror their "actual" time worked.[9] Further, Defendant's reports show that Securitas' practice is to use scheduled time instead of actual time for its payroll purposes in an effort to avoid un-billable time expenses. (*See* Ex. E at 289-294 [officer work times precisely matched the amount of time billable to the client]; Ex. AE – Weekly Hours Report SUSA 003797).

---

████████████████████████████████████████████████ [emphasis added])

[9] Specifically, Patricia Sykes testified that she entered time for approximately 400 officers on a daily basis and that 395 or 396 of the officers' actual time mirrored the scheduled time. *See* Ex. Z at 37-40.

3

This Court has already found that the rigid uniformity of the time sheets supported Plaintiffs' contention that they were fabricated:

> such across-the-board promptness calls into doubt any contention that the times of arrival and return are recorded on the sign in sheets and lends credibility to the plaintiffs' assertion that Securitas has a policy that requires all employees to enter the shift times on their sign in sheet regardless of whether time was spent before the shift, preparing for work, or after the shift, covering for late arrivals.

Order of Jan. 20, 2009 at 14-15 (Dkt. No. 104)

Securitas furthered its scheme by systematically failing to maintain accurate time records as required by state and federal law:

> [I]t is the employer who has the duty under 11(c) of the [FLSA] to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy.

*Anderson*, 328 U.S. at 687 ; *accord, Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2004 WL 1882449, at *4 (N.D. Ill. Aug. 18, 2004) ("Hard Rock cannot escape its responsibility to pay employees for all time worked by relying solely on the hours reported on employees' time sheets. Under both the FLSA and IMWL, employers, not employees, have a duty to keep accurate records of all hours worked by their employees."). Securitas edited Plaintiffs' and the Class' time records to reduce time worked and corresponding pay;[10] and, required, or at other times, knowingly encouraged and permitted, Plaintiffs and the Class to work without pay, in violation of the Illinois

---

[10] Securitas has erased, crossed out and whited-out Plaintiffs' hand written time records to reduce their pay and avoid its payroll obligations. (*See, e.g.,* Ex. D – SUSA 017719; 017733; 017734; 017758; 017762; 017766; 017773 Examples of Named Plaintiff, John Huebner's altered time records) Defendant's Branch Manager, Timothy Brown testified that he has seen white-outs, scratch outs, illegible signatures and missing signatures that are problems with Defendant's handwritten time sheets. (*See* Ex. E at 312-313) Securitas also provided written directives on how schedulers could redistribute overtime as straight time worked on its SAFES database (*See* Ex. F – Safes Quick Reference Guide at SUSA 016362-016363)

4

Minimum Wage Law, 820 ILCS 105/1 *et seq.,* ("IMWL"). Simply stated, the evidence shows *Securitas has a systematic problem of its officers working off the clock without pay.* As a result of its common schemes, Defendant has unjustly benefited by saving millions of dollars in payroll expenses.[11]

## II. DEFINITION OF THE CLASS

Plaintiffs ask the Court to certify a class defined as:

> All individuals who were employed or are currently employed by the Defendant, its subsidiaries or affiliated companies, in the state of Illinois as hourly paid, non exempt, uniformed security officers or other similarly titled positions at any time during the relevant statute of limitations period.

## III. LEGAL STANDARD

To maintain a class action, Plaintiffs must satisfy all elements of Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a). Plaintiffs seeking to certify a class must also show that the putative class meets one of the conditions set forth in F.R.C.P., Rule 23(b). Rule 23(b)(3) allows a class action for monetary damages where common questions of law or fact predominate over any questions involving individual members and a class action is superior to other methods of adjudication. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997) Importantly, under Rule 23(b)(3), "predominance" does not require *all* issues to be common or the same among all class members. Rather, "predominance" means the common issues represent a significant aspect of the case. Of course, here, the overriding

---

[11] Securitas' primary and consistent payroll objective is to precisely match the amount of coverage a client contracts for with the amount of time worked and paid to its officers. Similarly, Securitas seeks to avoid un-billable time and un-billable overtime (i.e. time worked by security officers that it cannot bill its clients) because it negatively affects Securitas' profits. (*See* Ex. B at 101-102; 304)

issue at the core of all claims is whether Securitas pays non-exempt security officers for all work they perform. This issue, standing alone, satisfies the "predominance" test.

"Before deciding whether to allow a case to proceed as a class action…a judge should make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Machs. Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001), *cert. denied*, 534 U.S. 951 (2001). "[I]f some of the considerations under Rule 23(b)(3)…overlap the merits… then the judge must make a preliminary inquiry into the merits." *Id*. at 676. However, "the 'preliminary inquiry into the merits' discussed in *Szabo* is a more limited one, that has as its focus not the substantive strength or weakness of the plaintiffs' claims, but rather whether the path that will need to be taken to decide the merits renders the case suitable for class treatment. It is in this limited sense that the Court assesses the 'merits' of plaintiffs' allegations in considering the class certification motion." *Humphrey v. International Paper*, 2003 WL 22111093, *3 (N.D. Ill. 2003)*; see also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 85 (D. Conn. 2009) ("whether the plaintiff had established all the Rule 23 requirements is not a license to delve into all merits issues"), *citing In re Initial Public Offerings Sec. Litig.* ("*IPO*"), 471 F.3d 24, 41-42 (2d Cir. 2006).

"Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 307 (3d Cir. 2008); *see* also *In re EPDM*, 256 F.R.D. at 85 (recognizing that a court must resolve any factual disputes relating to a Rule 23 requirement "as it would any other threshold issue."), *citing IPO*, 471 F.3d at 41-42. However, Plaintiffs need not prove their case as if at trial. "Plaintiffs' burden at the class certification is not to prove the

element[s]" of their particular claim. *In re Hydrogen Peroxide,* 552 F.3d at 311. "Instead, the task for plaintiffs at class certification is to demonstrate that [those elements are] capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311-12. "[A] court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002), *citing Szabo*, 249 F.3d at 677. Moreover, the district court "has broad discretion to determine whether certification of a class is appropriate." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993)*; see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979); *Payton v. County of Carroll*, 473 F.3d 845, 847 (7th Cir. 2007).

## IV. <u>FACTUAL BACKGROUND</u>

Defendant employed Plaintiffs and the Class as hourly paid security officers throughout the State of Illinois. Defendant required newly hired security officers to complete their standardized orientation and training program where they were provided with Securitas' employment policies (i.e. Securitas handbook), received their uniform, were assigned a post, completed paperwork and required to watch instructional videos.[12] Plaintiffs and the Class were provided and required to follow Defendant's standard employment policies such as Defendant's Dress Code Policy.

---

[12] Defendant's own handbook states that "Your first 90 days of employment are considered an introductory period. During this time you will participate in an orientation to Securitas USA and any training required for you to perform your job duties." (*See* Ex. H at Page 1468) Moreover, recently produced documents, confirm that security officers complete orientation after they are hired. (*See* Ex. Y – SUSA 027392-027394) Accordingly, such time is compensable work. Moreover, Securitas Branch Manager Tim Brown recently testified that Securitas previously failed to record officer time worked during orientation or pay officers for such time worked, but that there are plans to change Securitas' policies to begin recording officer time worked during orientation and pay them for such time. (See Ex. E at 208-216)

Defendant used hand written time sheets to record the total hours worked each day by the Plaintiffs and the Class. Defendant's handwritten time records typically reflect security officer scheduled hours and do not include the time worked by security officers working: 1) during orientation;[13] 2) to complete Securitas' ACT 1, 2 and 3 training programs; 3) before their scheduled start time; 4) after their scheduled end time; and, 5) to clean, press and otherwise maintain their Securitas uniforms to comply with Defendant's mandatory dress code and appearance policy.[14]

Plaintiffs and the Class were required to complete Defendant's standard orientation program after they were hired. (Ex. E at 208-217; Ex. G Defendant's Answer and Supplemental Answers to Plaintiffs' First Set of Interrogatories at No. 2; Ex. H at 1468; Ex. Y). Plaintiffs and the Class were subject to the same employment policies – namely the Securitas Handbook and Code of Ethics. (Ex. H at SUSA 001439-001487; Ex. I at SUSA 018714; Ex. B at 119, 138; Ex. E at 66; Ex. X at Nos. 3 and 4) Plaintiffs and the Class were provided with the same standardized job description and shared similar job duties. (Ex. J at SUSA 015203-015205; Ex. B at 84-85, 89; Ex. E at 65; Ex. X at No. 30; Group Ex. A). Plaintiffs and the Class were paid an hourly rate of pay and classified by the Defendant as non-exempt from the FLSA and IMWL. (Ex. B at 133, 138; Ex. E at 66; Group Ex. A; Ex. J at SUSA 015203-015205; Ex. X at No. 2) Plaintiffs and the Class were paid every two weeks (Ex. K at P183; Ex. E at 188).

Plaintiffs and the Class recorded their time on Defendant's hand written time sheets. (Ex. G at No. 2; Ex. L at SUSA 003780-003796; Ex. B at 144; 194; Ex. E at 67; *See* Group Ex. A). Plaintiffs and the Class were <u>not</u> instructed or required to sign out or

---

[13] (*See* Ex. E at Pages 212)
[14] (*See* Ex. E at Pages 170)

back in for meal breaks. (Ex. B at 247; Ex. E at 110-111). Plaintiffs and the Class were typically not provided with meal breaks due to the nature of their work as security officers. (Ex. G at No. 9; Ex. M at SUSA 000436, 000534, 001520; Ex. N at SUSA 003747-003748; Ex. O at SUSA 015226). Securitas used standardized payroll practices. (Ex. C at SUSA 003572, 003576-003579; Ex. B at 76, 104-105).

Defendant supervised all its branch locations in Illinois using the same management structure. (Ex. B at 137-138; Ex. E at 67-68). Defendant used the same program to train all of its Branch Managers on how to uniformly apply Securitas' policies and practices related to wage and hour matters. (Ex. O at SUSA 015214-015240).

Defendant required Plaintiffs and the Class to complete Securitas' ACT 1, 2 and 3 programs after they were hired. (*See* Ex. G at No. 15; Ex. I at SUSA 018725; Ex. B at 139-40; Ex. P; *See* Group Ex. A). On the job training, including ACT training, is compensable work for Plaintiffs and the Class. (Ex. N at 003753). Defendant maintained online training programs that were made available to Plaintiffs and the Class. (Ex. B at 141, 333-335; Ex. O at SUSA 015229-015230).

Plaintiffs and the Class were required to wear Defendant's uniform. (Ex. Q at SUSA00434-00435; Ex. H at SUSA 001459-001461; Ex. B at 139; Ex. E at 66; *See* Group Ex. A). Securitas outfitted its officers in one of three types of uniforms: 1) Military/Stationary Uniform; 2) Service/Reception Uniform; and, 3) Casual/Client Specific Uniform. (Ex. W at SUSA027218 – 027220; Ex. AG –Dep. of Securitas Rule 30(b)(6) witness on uniforms, Kieasha Steward at 85-86). Securitas used two uniform vendors to supply all of its security officer uniforms. (Ex. W at SUSA027214-027215; Ex. AG at 103).

Plaintiffs and the Class were required to comply with Defendant's dress code and appearance policy. (Ex. Q at SUSA00434-00435; Ex. H at SUSA 001459-001461; Ex. B at 118-119; Ex. E at 176-179; Ex. X at No. 14; *See* Group Ex. A). Plaintiffs and the Class were required to clean and maintain their uniforms and make sure they were wrinkle free. (*See* Ex. AG at 166). Plaintiffs and the Class were required to shine their shoes or boots, belts and other leather items of their uniforms. (Ex. Q at SUSA00434-00435; Ex. H at SUSA 001459-001461; Ex. R at SUSA 016340; Ex. B at 122-123; 279; Ex. E at 173-179, 261-262; Ex. W at SUSA027217; *See* Group Ex. A).

Defendant derived a benefit from its officers who spent time cleaning and maintaining their uniforms in compliance with the Securitas dress code. (Ex. B at 124; Ex. E at 174-176). Indeed, Security officer compliance with Defendant's dress code is an integral part of their job. (Ex. S at P173; Ex. B at 239; Ex. E at 270; Ex. AG at 174).

Nevertheless, Defendant did not pay Plaintiffs and the Class for any time they spent cleaning or pressing their Securitas uniforms. (Ex. B at 238-242; Ex. E at 103, 176; Group Ex. A; Ex. AG at 79). Defendant disciplined Plaintiffs and the Class who failed to comply with Defendant's dress code. (Ex. R at SUSA016340; Ex. B at 272-273; Ex. E at 299; Group Ex. A).

Plaintiffs and the Class were required to review and comply with post orders. (Ex. T –SUSA018813; Ex. S at P172; Ex. B at Page 178; 183; Ex. E at 46-48, 66-67; Ex. N at SUSA003745). Similarly, Plaintiffs and the Class were instructed to give and receive pass down instructions. (Ex. N at SUSA003745; Ex. B at 186; 189; Ex. E at 120-121).

Defendant did not use a punch clock, badge swipe or other mechanized system to record Plaintiffs' time worked for payroll purposes. (Ex. U at No. 22; Ex. E at 67; Group

Ex. A). Defendant used SAFES as its system to schedule all Plaintiffs (Ex. C – SAFES Manual at SUSA 003572; Ex. E at 67; 83-84; Ex. X – Defendant's Answer No. 51 to Plaintiffs' Rule 36 Requests). Defendant regularly entered Plaintiffs' and the Class' scheduled start times on hand written time sheets after they had already begun working. (Ex. E at Pages 121-130). Defendant regularly entered Plaintiffs' and the Class' scheduled end times on hand written time sheets before they had completed work. (Ex. E at Pages 121-130). Defendant did not provide a clock that Plaintiffs and the Class could use to identify their start and end times before they entered them on Defendant's hand written time sheets. (Ex. E at 114-115). Nor did Defendant provide Plaintiffs and the Class with any written directives on how they were supposed to identify their start time or end time for purposes of entering such times on Defendant's hand written time sheets. (Ex. E at 145; 321-324).

Defendant required, encouraged or permitted its management personnel to make edits to Plaintiffs' and the Class' hand written time sheets by erasing, crossing out and/or whiting out time entries. (Ex. D; Ex. E at 313-316). Defendant's hand written time records included entries that were crossed out, erased and/or whited-out. (Ex. D; Ex. E at 312-313).

Defendant's master schedules reflected the amount of security officer coverage requested by a client on a weekly basis. (Ex. B at 148-150; Ex. E at 75-79; Ex. X – Defendant's Answer No. 53 to Plaintiffs' Rule 36 Requests). Defendant used the master schedule to create working schedules. (Ex. B at 162-163; Ex. E at 82-86; Ex. X – Defendant's Answer No. 54 to Plaintiffs' Rule 36 Requests).

11

Defendant did not schedule any overlap time between shifts worked by Plaintiffs and the Class. (Ex. E at 145-146).

Defendant's hand written time sheets include one space reflecting the Plaintiffs' "in" time and one space reflecting the Plaintiffs' "out" time. (Ex. L – Sample Time Sheets, SUSA 003780-003796; Ex. E at 109-110). Defendant did not record Plaintiffs' break times. (Ex. L, SUSA 003780-003796; Ex. B at 253-254; Ex. E at 110-111).

Defendant's time sheets do not include a space for Plaintiffs and the Class to record time spent cleaning or maintaining their uniforms, nor did Defendant record this time. (Ex. L SUSA 003780-003796; Ex. B at 255-256; Ex. E at 170; Ex. AG at 97).

Plaintiffs and the Class were required to remain at their posts until properly relieved. (i.e. holding over). (Ex. K–Payroll/Attendance/Benefits at P183; *See* Group Ex. A). Defendant did not pay Plaintiffs or the Class for any overlap time. (i.e. when an officer from one shift is working the same time as the officer from the next relieving shift) (Ex. E at 145-146).

Defendant reflected the amount of hours requested by the client in the master schedule and sought to match the timesheets to that schedule. (Ex. B at 151-153, 163; Ex. E at 152; 82-86; 290-293). As a result, Defendant sought to avoid paying overtime to Plaintiffs and the Class. (Ex. E at 89-90; Ex. B at 363; Ex. X – Defendant's Answer No. 126 to Plaintiffs' Rule 36 Requests). Indeed, Defendant sought to avoid recording any time worked by Plaintiffs and the Class for which it could not bill a client. (Ex. B at 303-304; Ex. E at 100; Ex. X – Defendant's Answer No. 127 to Plaintiffs' Rule 36 Requests). The majority of Defendant's clients do not pay an overtime premium for hours worked by Plaintiffs over 40 per week, unless the client makes a special request.

12

(Ex. V – CTA Contract, CTA000045; Ex. E – Brown Dep. at Pages 86-88). Defendant's clients typically do not pay for Plaintiffs' training time or uniform maintenance.(Ex. B at 49, 160; Ex. AG at182).

Defendant therefore held regular meetings to discuss ways to minimize paying Plaintiffs for overtime, and to discuss ways to minimize un-billable time (Ex. E at 89-94; Ex. X at No's. 126-127). Defendant trained its branch managers and schedulers on ways to reduce and eliminate unbilled payroll expenses, including overtime pay. (Ex. AA).

One of Securitas' common problems was its failure to pay its officers for all hours worked including time worked pre and post shift, training, traveling and performing other off the clock work. (Ex. O at SUSA 015222; *See* Group Ex. A). Defendant has received hundreds of complaints from Plaintiffs and the Class about their pay. (Ex. E at 185-190).

As a result of Defendant's uniform companywide policies, practices and schemes described above, Defendant deprived Plaintiffs and the Class of minimum wages and overtime in violation of the IMWL. As a result of their unlawful practices, the Defendant benefited from reduced labor and payroll costs. Plaintiffs and the Class were all subject to Defendant's uniform policies and practices and were victims of Defendant's schemes to deprive them of earned minimum wages and overtime compensation. Securitas' liability to class members can be established by common proof, including the layers of evidence set forth above, in one trial. Specifically, the kinds of common evidence available include Securitas' admissions and conduct, Defendant's documents, deposition testimony, Plaintiffs' testimony, and anecdotal testimony. *Dukes v. Wal-Mart*, 474 F.3d 1214 (9th Cir. 2007) (indicating kinds of evidence capable of being used). After discovery is complete and the record is fully developed, this kind of evidence (if believed

once presented to a jury) could result in a finding of liability against Securitas for wage and hour violations.  The only question that might remain is the measure of damage owed each class member.

## V. ARGUMENT

### A.  Rule 23(a)(1) - The Class is So Numerous Joinder is Impracticable

The class is so numerous that joinder is impracticable.  A class of forty generally satisfies Rule 23(a)(1). *See Fletcher v. ZLB Behring LLC*, 2006 U.S. Dist. LEXIS 94838, at *24 (N.D. Ill., October 23, 2006)(citing cases).  Here, there is no question there are over 10,000 security officers who were subjected to Defendant's common schemes.[15]

### B.  Rule 23(a)(2): There Are Questions of Law or Fact Common to the Class

Plaintiffs have alleged common issues of law or fact.  Rule 23(a)(2) requires at least one common question of law.  *Tremble v. Ocean Bank*, 2006 U.S. Dist. LEXIS 93595, at **6-7 (N.D. Ill., March 21, 2006); *Belbis v. Warren,* 2002 U.S. Dist. LEXIS 22426 (N.D. Ill. Nov. 18, 2002), at *14 ("some factual variations among the class members does not defeat commonality, so long as there is at least one question of law or fact common to the class"); Newberg §3:10 at 272-74 (same).  It is not necessary to demonstrate that every question of law or fact is common to each member. *Lowers* at *4 (citing *Paxton*, 688 F.2d at 561).

> "Instead, Rule 23(a)(2) requires only that the course of conduct giving rise to a cause of action affects all class members, and that at least one of the elements of that cause of action is shared by all class members."  *Lockwood*, 162 F.R.D. at 575 (citing *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993)); *see also Baby Neal v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994).  Commonality may be found even where the individual class members are not "identically situated" so

---

[15] In the related *Howard* case, the Court ordered Defendant to produce a list of putative plaintiffs. (*See* Doc. No. 104)  Shortly thereafter, the Defendant produced a list of over 10,000 putative plaintiffs.  Moreover, Defendant admitted it employed over 10,000 guards.  (*See* Ex. X – Defendant's Answer No. 1 to Plaintiffs' Rule 36 Requests for Admission)

> long as the issues linking the class members are "substantially related to resolution of the litigation." *Paxton*, 688 F.2d at 561 (citation omitted).

*Id.* Under Rule 23(a)(2), "it is enough that they share common objectives and legal or factual positions." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) (internal quotation omitted). Common questions are said to exist, for example, when there is a "common nucleus of operative facts," *Egge v. Healthspan Services Co.*, 208 F.R.D. 265, 269 (D. Minn. 2002); or such as where the class share the same job title or duties in a wage and hour case. Commonality is always satisfied "when the legal question linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1174 (8th Cir.1995) (quotations omitted). "Thus, factual differences are not fatal to maintenance of the class action if common questions of law exist." *Bouaphakeo*, 564 F. Supp.2d 870,903 (N.D. Iowa 2008), *quoting Robinson v. Sears, Roebuck & Co.,* 111 F. Supp.2d 1101, 1120 (E.D. Ark. 2000); *see also* Newberg §3:10 at 271.

Commonality may be found in classes asserting wage claims, even if the named representatives or other class members are employed by the defendant in different branches, at different job sites or under other circumstances. *E.g. Torres v. Gristede's Operating Corp.*, 2006 WL 2819730, at *14 (S.D.N.Y. Sept. 29, 2006) ("They have submitted evidence that Defendant suffered, encouraged, and required them to work beyond their shifts. Plaintiffs share a common factual claim that they were not paid for their additional work. They also share a common legal claim that Defendant's failure to pay them for overtime hours is a violation of [State] minimum wage and overtime regulations."); *Mendez*, 232 F.RD. at 92 (commonality requirement satisfied where named plaintiff alleged he was subject to the same unlawful overtime policies as other

15

class members); *Chavez v. IBP, Inc.*, 2002 WL 31662302, at *3 (E.D. Wash. Oct. 28, 2002) (commonality requirement satisfied because challenged wage policies and practices applied to all class members).

Quite simply, Plaintiffs' claims present countless common questions of law and fact, including but not limited to:

   a.   Whether Defendant failed to keep true and accurate time records for all time worked by the Plaintiffs and the Class;

   b.   Whether Defendant's records of time worked are reliable where Defendant failed its duty to maintain true and accurate time records;

   c.   Whether Plaintiffs and the Class began work before the start of their scheduled shift to comply with Defendant's directives;

   d.   Whether Plaintiffs and the Class were paid for all the time they worked during orientation;

   e.   Whether Plaintiffs and the Class were paid for all the time they worked during training;

   f.   Whether the time spent during orientation and training is compensable;

   g.   Whether Plaintiffs and the Class worked each week cleaning and maintaining their uniforms to comply with Defendant's dress code and appearance policy;

   h.   Whether Defendant maintained records of break times taken;

   i.   Whether Defendant manipulated Plaintiffs' and the Class' time records to reduce their pay;

   j.   Whether Defendant failed to compensate Plaintiffs and the Class for all the work they required, encouraged or permitted Plaintiffs to perform;

   k.   Whether Defendant failed to compensate Plaintiffs and the Class for all work performed in excess of 40 hours per workweek with overtime premium wages;

   l.   Whether Defendant engaged in a pattern, practice or policy encouraging Plaintiffs and the Class to work "off-the-clock" and failing to pay Plaintiffs and the Class for such time worked "off-the-clock"; and,

16

m.      Whether the Defendant willfully failed to comply with state wage and hour laws.

Plaintiffs need only prove a common policy or practice, not its uniform application to everyone. *See, e.g.*, *Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337, 357 (Mass. 2008) ("in the liability phase of this putative class action, it is not the representative plaintiffs' burden to identify every 'specific' instance in which a member of the plaintiff class has been 'injured or harmed by Wal-Mart's actions or policies.' Rather, the plaintiffs' burden is to prove by a preponderance of the evidence that Wal-Mart engaged in an over-all, class-wide practice of time shaving, denying or discouraging rest breaks or meal breaks, and requiring off-the-clock work by its hourly employees. *Cf. International Bhd. of Teamsters v. United States,* 431 US 324, 360 (1977) (evidence of 'each person' harmed by general policy not required in order to prove that over-all policy existed).") The common question of law applicable to all of the class members is the applicability of the overtime wage protection of the IMWL to each class member. Plaintiffs anticipate Defendant will raise defenses that are common to the class.

**C.     Rule 23(a)(3):  The Claims Or Defenses Of The Representative Plaintiffs Are Typical Of The Claims Or Defenses Of Class Members**

Typicality is closely related to commonality. *Ruiz v. Stewart Assoc.*, 171 F.R.D. 238, 242 (N.D. Ill. 1997)  A Plaintiff's claim is typical if it: 1) arises from the same event, practice, or course of action that gives rise to the claims of other class members; and, 2) the claims of the Plaintiff and the class members are based on the same legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "Like commonality, the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625 (5th Cir. 1999).  In *Lowers*, this Court explained: "The burden of demonstrating

17

typicality [the third requirement under Rule 23(a)] is fairly easily met so long as other class members have claims similar to the named plaintiff." *Lowers v. United States*, at *5 ,*quoting DeBoer*, 64 F.3d at 1174. Put differently, typicality under Rule 23(a)(3) suggests "there are other members of the class who have the same or ***similar*** grievances as the plaintiff." *Lowers* at *4. Accordingly, typicality is satisfied "if the claims of all members arise from a single event or share the same legal theory." *Lowers* at *5, **15-16.

In *General Telephone Co. v. EEOC*, the Supreme Court remarked, "[t]he typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims." 446 U. S. 318, 330 (1980). The rationale being that a plaintiff with typical claims will pursue his or her own self-interest in the litigation, and in so doing, equally advance the interests of the absent class members. *Newberg §3:13 at 325*. Naturally, in adjudicating such a plaintiff's claim, the court would of necessity also be deciding the common questions of the defendant's wrongdoing as to the class generally. In this way, typicality means Plaintiff's claims and the claims of all potential class members arise from the same course of action of Defendants – again, the alleged failure to pay overtime; and the claims of the Plaintiffs and the potential class also arise from the same legal theory, an alleged violation of the IMWL. *Barragan v. Evanger's Dog and Cat Food Co., Inc.,* 259 F.R.D. 330 (N.D. Ill. 2009). Thus, the test of typicality does not refer to the "relief sought" or "the specific facts from which the claim arose," but instead refers to the nature of the claim and legal theory asserted by the class representative.

In cases involving claims for violations of state wage laws, typicality generally is satisfied because the named plaintiffs and absent class members have been injured by the same course of unlawful conduct. *Barragan v. Evanger's Dog and Cat Food Co., Inc.,*

18

*259 F.R.D. 330*, (N.D. Ill. 2009); *Wenthold, et al. v. AT&T Technologies, Inc.,* 142 Ill. App.3d 612 (1st Dist. 1986); *Wang*, 231 F.R.D. at 608 (typicality requirement satisfied where named plaintiffs alleged they were subject to the same policies that systematically deprived other class members of compensation); *Mendez* 232 F.R.D. at 92 (typicality requirement satisfied where named plaintiff alleged he was subject to the same unlawful policies as other class members); *Chavez*, 2002 WL 31662302, *2 (even if named plaintiffs did not perform the same work as each and every other class member, "it is sufficient for current purposes that the alleged injury to the named class representations is similar to the injury to other class members); *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 392 (W.D.N.Y. 2005) (typicality requirement satisfied where all the proposed class members were allegedly subject to the same types of unlawful (wage) deductions, regardless of their job titles or duties). Here, all the named Plaintiffs, like all other members of the class, were employed as non-exempt, hourly paid security officers in Illinois during the class period, and all consistently recorded their time in the same way, shared the same duties and were denied hard earned overtime pay. The named Plaintiffs and all other putative class members assert claims based on the identical theories that they were denied overtime, based on: 1) Defendant's failure to maintain accurate time records; 2) Defendant's improper edits made to Plaintiffs' time records to reduce their pay; and, 3) unpaid work performed by Plaintiffs for Defendant's benefit including work performed during orientation, training, pre-shift, post shift and cleaning and maintaining their Securitas uniforms. These claims —which arise from Defendant's uniform policies and practices—satisfy typicality.

**D.    Rule 23(a)(4):  The Representative Plaintiffs Will Fairly And Adequately Protect The Interests Of The Class; Counsel Is Adequate**

The Class Representatives Stephanie Hawkins, Darsemia Jackson and Merija Wallace and their attorneys, Stephan Zouras, LLP, Miller Law LLC and Law Offices of Thomas M. Ryan, P.C., will fairly and adequately protect the interests of the class. The Class Representatives were employed by Defendant as hourly paid employees during the class period, were victims of the same illegal compensation scheme as the employees they seek to represent, and are not seeking any relief which is potentially antagonistic to other members of the class. Their attorneys, Stephan Zouras, LLP, Miller Law LLC and Law Offices of Thomas M. Ryan, P.C. and their principals, are highly experienced and recognized attorneys in employment law and wage and hour law and have been designated as class counsel in other class and collective actions in the state and federal courts. (*See* Ex. AF – Firm Resumes). Stephan Zouras, LLP, Miller Law LLC and Law Offices of Thomas M. Ryan, P.C., have the ability and the resources to manage this case.

### E. The Requirements of Rule 23(b) Are Satisfied

In addition to the four requirements discussed above under Rule 23(a), the action must satisfy at least one of the three parts of Rule 23(b) in order to be certified. In considering whether common questions predominate, courts are to consider questions of law as well as fact. Here, common *factual* issues outweigh the individual ones, and there are no individualized *legal* issues whatsoever, rendering this analysis facile and the result obvious. All the Plaintiffs worked for the Defendants as hourly paid, non–exempt employees, completed Defendant's uniform orientation and training programs, shared the same duties, recorded their time in the same way, worked before and/or after their scheduled shifts, were subjected to Defendant's improper time keeping, wore Securitas

uniforms, cleaned and maintained their Securitas uniforms, and were deprived of wages they earned. Here, the action satisfies Rule 23(b)(1) and (b)(3).

### 1) Rule 23(b)(1): There are Risks of Incompatible Standards of Conduct and Inconsistent Adjudications of Plaintiffs' Claims if They are Not Decided In a Single Trial

Rule 23(b)(1) authorizes a class action if the prosecution of separate actions by individual members of the class would create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards or conduct for the party opposing the class, or (b) a dispositive ruling that would substantially impair or impede the ability of absent class members to protect their interests. Rule 23(b)(1)(A) directs the Court to consider whether individual actions would have an adverse affect on the party opposing the class. This requires the Court to assess the risk that: (a) separate actions will be brought in the absence of a class action, and (b) different results in separate actions would put the opposing part in conflicting positions. *Reynolds v. National Football League*, 584 F.2d 280, 283-84 (8th Cir. 1978); *Powell v. National Football League*, 711 F. Supp. 959, 969 (D. Minn. 1989). Rule 23(b)(1)(B) directs the Court's attention to the impact on the absent class members.

Here, there is a substantial risk that separate actions will be brought if a class is not certified,[16] and that separate actions would place Securitas in conflicting and

---

[16] Here, the 1,200+ opt-ins in the *Howard*, FLSA collective action already illustrates interest among security officers to pursue their legal claims for unpaid wages. This level of interest means it is likely that security officers would bring legal actions against Securitas and assert their state-law claims if no class is certified. Indeed, as long as the *Howard* action proceeds as a collective action, the FLSA opt-in plaintiffs will need to assert their state law claims or have them barred forever based on preclusion principles. The risk of multiple lawsuits increases substantially more if the collective action is decertified. And while many security officers may conclude individual actions are not economically feasible or, as this Court understands, may simply be afraid to sue their employer and thus forgo asserting their legal rights, it only takes two lawsuits to place Securitas in an irreconcilable and conflicting position.

irreconcilable legal positions, especially as to determinations of compensable work for

such things as training and uniform maintenance. As was recently explained in a hybrid

FLSA/Rule 23 wage class action certified in Nebraska:

> [T]he court finds the defendant's uniform pay system affects each employee in the same way. Further, a determination about whether the pay system is a violation of state statute should be uniform for each plaintiff. *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 396-97 (E.D. Pa. 2001) ("Certifications under [Rule 23(b)(1)] are common in labor relations cases because defendants often provide 'unitary treatment to all members of [a] putative class [in this] ... area' and thus the rights of absent 'class member[s] [are often] ... implicated by litigation brought by other class members.").

*Lopez v. Tyson Foods*, 2008 WL 3485289, at *18 (D. Neb. Aug. 7, 2008).

Securitas admits that its job description, job duties, employee handbook, dress

code and appearance policy, scheduling and schedule based timekeeping system and how

such data is maintained on SAFES and its hourly rate of pay policies are uniform across

the company for all security officers. Thus, Securitas is obliged to treat all security

officers alike when it comes to the predominance of issues in this case, such as: which

tasks constitute "work"; whether time spent cleaning and maintaining uniforms is

compensable; whether time worked during orientation is considered work and must be

paid;[17] whether time spent during Securitas ACT training is compensable, whether

uniform expenses, such as dry cleaning are reimbursable and whether Securitas is

required to keep records of the above listed time worked. These issues can be condensed

to the simple understanding that if the performance of a task is "work" for one security

officer it must also be "work" for every security officer in the State of Illinois. *See*

*Amchem*, 521 U.S. at 615. "There is a risk that if each of the … employees were to

---

[17] It appears that Defendant has admitted that such time worked during orientation is compensable and has just recently changed its practice from not paying for time worked during orientation to now paying for time worked during orientation (*See* Ex. E at 208-216; *See* Ex. Z at 66-70)

litigate separately varying outcomes would result with regard to, for example, the types of activities which are compensable." *Lopez*, *supra*, at *18. Therefore, Securitas should face its legal obligations to all class members in a single trial. Because separate actions could place Securitas in all but certain irreconcilable conflicting positions, class certification under Rule 23(b)(1) is warranted.

### 2) Rule 23(b)(3): Common Questions of Law And Fact Predominate and a Class is Superior to Joinder of Claims or Hundreds of Lawsuits

Notwithstanding any determination by this Court under Rule 23(b)(1), certification is appropriate under Rule 23(b)(3). A class may be certified under Rule 23(b)(3) when:

> The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Rule 23(b)(3) specifies four factors pertinent to the Court's determinations regarding predominance and superiority:

> (A) the class member's interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and,
>
> (D) the likely difficulties in managing a class action.

### a. Common Questions Predominate

The numerous common questions of law and fact set forth in the commonality discussion above predominate over individual questions because Securitas' alleged

23

activities and the impact of Securitas' policies and practices affected class members in

the same manner: They were subjected to a policy of suffering work without pay.

> In determining whether the plaintiff has met Rule 23(b)(3)'s more stringent requirement that common issues predominate over individual issues, the court inquires into the nature of the evidence required to prove the case. *Blades*, 400 F.3d at 566. If, to make a prima facie showing on a given question, the members of a proposed class must present evidence that varies from member to member, then it is an individual question for purposes of Rule 23(b)(3); if the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

> As with the commonality requirement, however, the presence of individual issues such as damages does not automatically preclude a finding of predominance under Rule 23(b)(3).

*Liles v. American Corrective Counseling Serv., Inc.*, 231 F.R.D. 565,575 (S.D. Iowa

2005). Moreover, although this class-wide proof would, in fact, resolve the issue of

liability, the predominance test under Rule 23 does not require that it do so. To

predominate, common questions need not be dispositive of the action because

"predominant," as used in the rule, does not mean "determinative." Wright & Miller

§1788 at 528-29. Rather,

> courts have held that [a class action] can be brought...even though there is not a complete identity of facts relating to all class members, as long as a 'common nucleus of operative facts' is present.... The common questions need not be dispositive of the entire action.... Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the [class] will be considered proper.

*Id.* In this case, virtually all issues advancing the litigation are common. *See Mullen*, 186

F.3d at 627 (predominance is determined not by counting the number of common issues,

but by weighing their significance).

In considering whether common questions predominate, courts are clearly

directed to consider questions of law as well as fact. Here, common ***factual*** issues

outweigh the individual ones, and there are no individualized ***legal*** issues whatsoever,

rendering this analysis facile and the result obvious. And, as discussed in more detail, *infra,* while damages issues (which are **expected** to remain for later resolution) are, to at least some degree, unique to each class member, they can be addressed through the use of common trial management tools and, in any event, come nowhere close in number or significance to overshadowing the myriad uniform questions that can and should be tried class-wide.

All of the factual and legal questions identified above can be tried on a class-wide basis. And, resolution of these questions based on common and class-wide evidence will "represent a significant aspect of the case," going a long way toward "resolv[ing] for all class members in a single adjudication" the same liability issues. Given this, "there is clear justification for treating the case as class rather than on an individual basis," *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 675 (S.D. Fla. 1997), because Securitas "committed the same unlawful acts in the same method against an entire class." *Kennedy v. Tallant*, 710 F.2d at 717.

As the court in *Bouaphakeo v. Tyson Foods, Inc.*— an off-the-clock case — explained, predominance was satisfied because all class members needed to prove was that "they are not paid for all the work they perform under Tyson's gang time compensation system. To do so, the class members would need to show that they perform work which goes unpaid…." with common evidence. 564 F. Supp.2d at 909. The court emphasized that although not all employees paid under Tyson's payroll and time-keeping system ("gang time") were treated uniformly or similarly by the policy, the court explained that "common evidence," if believed, showed that "Tyson's compensation system cannot account for even the basic or standard PPE employees need

to don, doff, and clean would establish a prima facie case for the class." *Id.* Thus, the court acknowledge that while "[i]ndividual questions may exist…the court does not believe they predominate." *Id.*

Similarly, here, the evidence shows Securitas' time-keeping and payroll system is schedule based and did not account for or capture time security officers spent: during new employee orientation; training, including ACT training; cleaning and pressing Securitas uniforms to comply with the Securitas dress code; working before the start of their shifts reviewing post orders, receiving pass down instructions, checking out equipment or performing other work; and, staying late until they were relieved pursuant to Securitas' holdover policy - duties that are required of most, if not all every security officers every pay-period.[18] Indeed, it is patently obvious upon the face of Securitas time sheets that Securitas did not record the above mentioned time as Securitas timesheets do not even provide the opportunity for security officers to record time spent during orientation or cleaning and pressing their uniforms. (Ex. E at 103, 170 - 176).

Numerous class actions have been certified for "off-the-clock" violations of state or federal wage laws. *E.g.*, *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005); *U.S. Dept. of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775 (6th Cir. 1995); *McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988); *Spoerle v. Kraft Foods Global, Inc.*, 2008 WL 2002221 (W.D. Wis. May 6, 2008); *Torres*, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006); *Wang*, 231 F.R.D. 602 (C.D. Cal. 2005); *Velez v. Majik Cleaning Service, Inc.*, 2005 WL 106895 (S.D.N.Y. Jan. 19, 2005); *Gutierrez v. Kovecavich "5" Farms*, 2004 WL 3745224 (E.D.

---

[18] *See* [Exs. 38 & 38A (Under Seal)]; *see also Lockwood*, 162 F.R.D. at 580 ("It is now well established that a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position").

Cal. 2004); *Belbis*, *supra*; *Ladegaard*, 2000 WL 1774091 at * 4-5; *Leyva v. Buley*, 125 F.R.D. 512, 518 (E.D. Wash. 1989); *Brzychnalski v. Unesco, Inc.*, 35 F. Supp. 2d 351 (S.D.N.Y. 1999). Just this past year, Plaintiffs' counsel had two off-the-clock cases certified under Rule 23. *See Farmer, et al v. DirectSat, USA, LLC*, 08 CV 3962 (N.D.Ill. St. Eve, J.; *See Ellenbecker et al v. North Start Cable, Inc.*, 09 CV 07293 (N.D. Ill., Lindberg, J.). Certification is appropriate in this case too.

###### b.  Plaintiffs Have A Common Method For Calculating Damages

The common methodology for calculating damages in this case is set by statute. Under the IMWL, all time worked up to 40 hours per week is to be compensated at the normal hourly wage. All time in excess of 40 hours per week must be calculated at time and a half. (820 ILCS §105/4(a)) The IMWL also provides that employees, who are not properly paid overtime, are entitled to 2% interest each month for such underpayment. (820 ILCS §105/12).

The exact formula for calculating damages is as follows: Total number of weeks worked during the statutory time period "TWW" (x) number of hours worked off the clock per week "HPW" (x) applicable rate(s) of pay "ROP" (x) 2% monthly interest = Damages.

###### ["TWW" (x) "HPW" (x) "ROP" (x) "INTEREST" = DAMAGES]

Defendants maintain electronic records of each Plaintiff's Total Weeks Worked and Rate of Pay[19] and these numbers can be inserted into an excel spreadsheet or other database to run damage calculations. Moreover, we know the rate of interest under the IMWL is 2% per month. The only unknown component of the calculation is the amount

---

[19] The evidence shows that virtually all of the class members earned $9.50-$12.00 per hour as their normally wage. Using If the Court finds that using individual wage rates is unmanageable, a single average wage could be computed across all class members.

of hours worked per week without pay which can be established using common proof. Specifically, Plaintiffs and the Class seek to recover unpaid wages for unpaid time worked under several categories: A) Time worked without pay during introductory training or orientation; B) Time worked without pay cleaning and maintaining their Securitas uniforms; C) Time worked without pay before the start of their shifts; D) Time worked without pay as holdovers after the end of their scheduled shifts; and, E) Time worked performing other training.

**Orientation**:  After being hired, Securitas required its officers to perform new employee introductory training, also known as orientation.[20]  During orientation, officers are required to: meet with their branch manager or scheduler to receive their post assignment; obtain their Securitas mandated uniform; get a photo ID; complete new hire paperwork; obtain and review the Securitas handbook; receive and review benefit information and begin assignment training amongst other things.[21]  Throughout the majority of the statutory period, Securitas failed to record the time spent by its officers during orientation or pay them for such work.[22]  Plaintiffs recently discovered that beginning in January, 2010 Securitas started to pay its officers for time worked during orientation.[23]  Because Securitas required Plaintiffs and the Class to perform introductory training without recording such time worked and paying for such time worked, this is a common claim applicable to all officers who performed such training before January,

---

[20] Defendant's own documents, including its handbook, confirm this training is done after the officer is hired (*See* Ex. H at SUSA 001468) Defendant's timekeeper also testified that: all officers are required to complete orientation after they are hired; that the class takes about 4 hours to complete; that Securitas did not record or pay for time worked by officers during orientation and that Securitas has plans to start paying officers for time worked during orientation. *See* Ex. Z - Sykes Dep. at Pages 66-70.
[21] *See* Ex. Y - SUSA 027392-027394.
[22] Evidence in this case shows that such training typically took one day.
[23] (*See* Ex. E at 208-216; *See* Ex. Z at 66-70)

2010.  Because Defendants failed to record this time worked and the other evidence in this case confirms that such training typically took one day, Plaintiffs and the Class should be credited with eight (8) hours of unpaid time worked during orientation.

**Cleaning and maintaining Securitas uniforms:**  Securitas had a standardized policy of requiring each guard to clean and maintain his or her uniform in an unwrinkled condition.[24]  However, Securitas fails to pay its officers for the time they spend cleaning, pressing, altering and otherwise maintaining their uniforms.  This category of damages applies to every class member at every location.  Securitas' HEROES training materials admits that class members should be compensated an additional one (1) hour per week to care for their uniforms.[25]  Nonetheless, Securitas has failed to provide any directives or mechanisms for officers to record such time worked.  Indeed, virtually all class members reported spending more than one hour per week cleaning and maintaining their uniforms.  Using the guidelines established in *Anderson v. Mt. Clemmons*, the fact finder could use Securitas' own documents to establish a floor of one hour per week and then decide to increase that amount based on Plaintiffs' testimony.  Because virtually all class members were scheduled for 40 hour weeks, and this time is in addition to what they were compensated for, it would be paid at overtime.  Thus this category comprises at least one (1) hour per week of overtime for every class member.

---

[24] *See* Ex. Y and H.  Securitas officers typically wear one of three types of uniforms: 1) The military style "hard" look; 2) the reception style "soft" look uniform; or, 3) the client specific uniform.  With very limited exceptions, all uniforms require additional maintenance and are not wash and wear.  For example, the hard look uniforms include a shirt, tie and pants that require ironing as set forth on the care and maintenance tags.  The soft look uniform includes a shirt that requires ironing as well as a blazer and pants that are dry clean only.

[25] *See* Ex. W – Defendant's HEROES Manual "The Office" at SUSA 027217 which states:

**Pre-shift time:** Securitas had a uniform practice of requiring class members to arrive for work and start performing Securitas duties before the scheduled start time over every shift. Specifically, officers are required to arrive early to review post orders, check out equipment, line up for inspection, receive pass down instructions and perform other work to prepare for their shifts. Securitas failed to record this time spent working and instead used officers' scheduled time for payroll purposes. Accordingly, this Court should look at Plaintiffs' testimony and other evidence which provides a reasonable estimate showing that officers, on average, began work 15 minutes before the start of their shifts. This category of damages applies to every class member at every location. Because virtually all class members were scheduled for 40 hour weeks, and this time is in addition to what they were compensated for, it would be paid at overtime. Thus, this category comprises 1¼ hours per week of overtime for every class member.

**Routine post-shift or holdover time:** Securitas required its officers to maintain their posts until they are relieved. From time to time, class members were required to work 15-30 minutes after the scheduled end of each shift without pay. Securitas did not pay its officers for such periods of holdover time. Because virtually all class members were scheduled for 40 hour weeks, and this time is in addition to what they were compensated for, it would be paid at overtime.

**Training:** Securitas does not contest that its officers perform security guard training. Securitas does, however, contest Plaintiffs' claims that such training is compensable.[26] Specifically, Securitas argues that its' mandatory ACT 1, 2 and 3 training is really PERC card training. Plaintiffs disagree with Defendant's

---

[26] Defendant's attempted defenses in this case contradict its own documents which state that ACT training is compensable. (*See* Ex. AB – SUSA 003753)

characterization because the ACT training covers a whole range of Securitas specific topics that are not required for PERC licensing. Whether or not such training is compensable creates a common question of fact that is perfectly suited for determination on a class wide basis. Securitas required all class members to complete ACT training over a two day period after they were hired. The time spent by officers during this training was not recorded or paid by Securitas for any officers. Accordingly, should Plaintiffs prevail on the merits of this claim, each officer should be compensated for at least twenty (20) hours of training time.[27]

In addition to the ACT training, some guards were required to complete site specific training in subjects such as K-9 handling procedures.[28] Unlike the mandatory introductory training and ACT training, this training may vary based on the particular client. However, Securitas' records and databases, such as its Learning Management System ("LMS") should provide insight into whether such training was conducted and/or paid. While this may require some individualized damages analysis for this particular component of Plaintiffs' claim, it is not a basis to deny certification.

Thus damages sought in this suit can be calculated on a class-wide basis using Defendant's own data and the layers of evidence proving that Plaintiffs and the Class worked unpaid time off the clock. Should the Court find that the inclusion of any particular category of damages would make the class unmanageable, Plaintiffs request that the Court certify the class as to the remaining categories of damages. Without the benefit of a class action, the class members have no realistic chance of receiving any compensation at all.

---

[27] Defendant has admitted that such training is 20 hours. Ex. G at No. 15.
[28] *See* Ex. AC – SUSA 027857-027858; Also *See* Ex. AD - K-9 Certificate of Training.

31

**c.    Calculating Individual Damages Does Not Create an Individual Issue That Might Defeat Certification**

In this case, Securitas has electronic records maintained on its SAFES database that reflect security officer weeks worked, rates of pay, and total compensation. Accordingly, it is possible to include this data in one universal calculation of damages. The only missing component of such an analysis is the unpaid time worked off the clock each week by security officers – one of the seminal issues in this case.  Because Securitas is not permitted to transfer its record keeping obligations to security officers, this is not a basis to deny certification.

While some part of the calculation of damages might entail an individualized undertaking, such an individualized inquiry does not defeat class certification.[29] Moreover, a class may include some parties who are ultimately determined not to have been harmed:

> A class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown.   Such a possibility or indeed inevitability does not preclude class certification, despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct.

*Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.).

---

[29] *E.g.*, *VISA Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139 ("[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *In re FedEx Ground Package System, Inc., Employment Practices Litig.*, 2007 WL 3027405, *13 (N.D. Ind. Oct. 15, 2007) ("While individual issues may exist in determining the damages suffered, 'it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.'").  *Accord, Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796, 798 (10th Cir. 1970); *Blackie v. Barrack*, 524 F.2d at 905; *Walton v. Franklin Collection Agency, Inc.*, 190 F.R.D. 404, 412 (N.D. Miss. 2000); *Liles*, 231 F.R.D. at 575; *Spoerle*, 2008 WL 2002221, at *6; *Mendec*, 232 F.R.D. at 92-93.

       d.      **A Class Action is the Superior Method of Adjudicating These Claims**

Regarding the superiority inquiry, the court is to compare the possible alternatives to a class action and determine if any is superior to the proposed class action. The alternatives to class action litigation in this case are individual lawsuits by class members. There is no doubt this would be more burdensome on the class members, and it would likely be less efficient use of judicial resources. *Valentino v. Carter-Wallace,* 97 F.3d 1227, 1234-35 (9th Cir.1996) ("Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."). Under such circumstances, the court should find that the superiority requirement has been met. *Bouphakeo*, 564 F. Supp.2d at 909.

Here, there is no indication that individuals have an interest in controlling their cases or that another forum might be more convenient. And, whatever manageability issues might arise, such issues "ordinarily do not prevent class certification." Newberg §9:1; *Workers' Comp.*, 130 F.R.D. at 110 ("dismissal for management reasons is never favored"). As many courts have recognized, "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action," including bifurcation of the liability and damages phases of the trial, the appointment of a magistrate judge or special master to proceed over individual damages proceedings, decertification of the class following the liability determination, with notice to the class members how to proceed to prove damages, and the creation of subclasses (as has been suggested here). *Visa Check/MasterMoney*, 280 F.3d at 141; *see also* Newberg §4:32, at 287-88.

33

Unless this case proceeds as a class action, numerous class members will, as a practical matter, be left without a remedy and Securitas will have avoided much liability. Discovery costs alone dwarf the potential recovery. This is truly a case where to deny certification and "permit [Securitas] to contest liability with each claimant in a single separate suit...would...give [Securitas] an advantage which would be almost equivalent to closing the door of justice to all small claimants." *Weeks v. Bareco Oil Co.*, 125 F.2d 84, 90 (7th Cir. 1941); *accord*, *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 732 (N.D. Ill. 1977). Certification will help equalize the ability of the Plaintiffs and the Class to prepare and pay for the advocacy of their rights.

Because it is not feasible for the class members to adjudicate their separate claims individually, the superiority of a class is evident, and should be certified here.

## VI. CONCLUSION

As demonstrated above, Securitas has acted in a common fashion to deprive the class members of wages to which they are entitled under the IMWL. The Plaintiffs therefore respectfully request that the Court grant Plaintiffs' Motion for Class Certification, appoint the named Plaintiffs as class representatives, and appoint their counsel as class counsel.

Dated: April 7, 2010                         Respectfully submitted,


                                             By: */s/ Ryan F. Stephan*
                                             James Zouras
                                             STEPHAN ZOURAS, LLP
                                             205 N. Michigan Avenue, Suite 2560
                                             Chicago, Illinois 60601
                                             312-233-1550

                                             Marvin A. Miller
                                             Matthew E. Van Tine

MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
312-332-3400

Thomas M. Ryan
Law Offices of Thomas M. Ryan PC
35 E. Wacker Drive, Suite 650
Chicago, IL 60601
312-726-3400