**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **STEPHANIE HAWKINS, DARSEMIA JACKSON and MERIJA WALLACE Individually, and on Behalf of All Others Similarly Situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 09 C 3633** |
| **v.** | ) ) | **Hon. Gary Feinerman** |
| **SECURITAS SECURITY SERVICES, USA INC.,** | ) ) ) | **Magistrate Judge Kim** |
| **Defendant.** | ) ) | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR RENEWED MOTION FOR CLASS CERTIFICATION ON PLAINTIFFS' UNIFORM MAINTENANCE CLAIMS

In its response, Defendant argues this Court should deny certification based on the exceptions not the rules. Namely, Defendant wants this Court to overlook its common dress code policies (the "rules") and nit pick inconsequential variations of class members' compliance with such policies (the "exceptions"). Defendant also asks this Court to buy into its off-set defense even though its own policies require officers to remain on duty during meal periods; even though it failed to comply with its obligations to record these purported periods; and even though its offset argument is clearly a damages issue which is not a basis to preclude certification. Defendant's arguments are misleading, contradict its' own stated policies and fail as a matter of law. Moreover, Plaintiffs' more narrowly defined class of officers who wore either the Hard Look or Soft Look uniforms cures any concerns the Court may have. Such a defined class is easily ascertainable by using Defendant's own records and, by definition, consists of employees who wear uniforms that require special maintenance beyond simple washing and wearing. Accordingly, and

consistent with the Court's October 18, 2011 ruling, there is a sufficient degree of uniformity for Plaintiffs' uniform maintenance claims to proceed on a class wide basis. (*See* Dkt. No. 167-1 at *6-7)

## **ARGUMENT**

The ultimate question for the jury in this case is whether officers complied with Defendant's clear and unambiguous written policies. If the answer is "yes", then Plaintiffs will be owed wages for time spent maintaining their uniforms.[1] This question, however, is not a question for class certification. The question for certification is whether Plaintiffs have common claims that predominate. The existence of Defendant's common and undisputed policies, the uniforms and maintenance tags themselves, and Defendant's HEROES Manual, which all require special uniform maintenance mandate an inescapable "yes" answer to the question of predominance. The substantial compliance by the non-trivial majority of class members is an added exclamation point.

### A.    **Plaintiffs' Uniform Maintenance Claims Are Easily Ascertainable**

In their Renewed Motion for Class Certification, Plaintiffs narrowed their definition of the class to all officers who wore Defendant's Hard Look ("Military Style") or Soft Look ("Reception Style") uniforms. At the December 7, 2011 status, the Court asked whether such class members were ascertainable. (*See* Ex. A – December 7, 2011 Transcript of Proceedings) Despite unsupported representations from defense counsel that such uniforms are wash and wear, the answer to the Court's inquiry is plainly "yes." It is undisputed that Defendant maintained records showing which officers were assigned Hard Look uniforms and which were assigned Soft Look uniforms.

---

[1] Defendant would also be prohibited from asserting an offset defense because the finder of fact would determine that officers complied with Securitas policies and ate meals while on duty, thus making such time compensable by law.

### i. Defendant Knew Its Officers Did Much More than Wash and Wear Their Uniforms, and That They Did So Without Pay

Despite arguments made in its response that supervisors somehow lacked knowledge about the extensive uniform maintenance performed by security officers, it is undisputed that Securitas itself had actual or constructive knowledge. Defendant knew or should have known officers maintained their Hard Look and Soft Look uniforms without pay because of: (1) its common dress code policies; (2) the care and maintenance tags on the Hard Look and Soft Look uniforms themselves; and, (3) its own HEROES Manual which all required officers to clean and press/iron their uniforms and perform other maintenance without pay. Defendant implemented these policies and selected these uniforms so that officers would comply with them and present a professional image for Securitas and its clients – which is exactly what those officers did. (*See* Ex. B – Representative Plaintiff Sample Testimony)

**Defendant's Dress Code Policies**

In their Motion, Plaintiffs identified Defendant's common dress code policies which require officers to **clean and press** their Hard Look and Soft Look uniforms. (*See* Dkt. No 167)  Normally, where there is a common policy requiring off the clock work, Courts will not hesitate to certify Plaintiffs' claims.[2]  Nonetheless, nowhere in its

---

[2] *See, e.g.*, *Nobles v. State Farm Mut. Auto. Ins. Co.,* 2011 WL 3794021, at *3-4 (W.D.Mo. Aug. 25, 2011) (existence of written pay policy which plaintiffs claim does not comport with the wage laws is sufficient to establish commonality under Rule 23); *Ross v. RBS Citizens,* 2010 WL 3980113, *3 (N.D.Ill. Oct.8, 2010) ("A policy applicable to a class of employees is enough to establish a common question of fact or law."); *Driver v. AppleIllinois, LLC*, 265 F.R.D. 293, 306 (N.D.Ill. 2010) (same); *Kumar v. RadioShack Corp*., 254 F.R.D. 387, 396 (C.D.Cal. 2008) (legality of employer's stated policies indisputably presents common question warranting Rule 23 class certification); *Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337, 357 (Mass. 2008) ("in the liability phase of this putative class action, it is not the representative plaintiffs' burden to identify every 'specific' instance in which a member of the plaintiff class has been 'injured or harmed by Wal-Mart's actions or policies.' Rather, the plaintiffs' burden is to prove by a preponderance of

3

response does Defendant attempt explain away its own stated policies. Nor does Defendant cite to any written policies that instruct officers that their uniforms are "wash and wear." Like the *Nobles, Ross, Driver, Bouaphakeo* and other cases cited above where there is an undisputed common policy, Plaintiffs' claims here must be certified.

**Uniform Care and Maintenance Tags**

Plaintiffs provided this Court with an additional common factual basis to certify Plaintiffs' claims – Defendant's uniform maintenance tags which explicitly require ironing, separate washing and dry cleaning. (*See* Dkt. No. 167-5 to 167-7) These tags explain why Defendant requires its officers to "press" their uniforms and why the words "wash and wear" are nowhere to be found in its policies – because such uniforms are made of materials that require special care and maintenance. Defendant was free to select polo shirts or other uniforms that were actually "wash and wear", but chose not to because such clothing would not provide the business or military style presence or "look" Securitas and its clients required. Accordingly, because the common maintenance tags on Defendant's uniforms require special maintenance, Plaintiffs' proposed class must be certified.

---

the evidence that Wal-Mart engaged in an over-all, class-wide practice of time shaving, denying or discouraging rest breaks or meal breaks, and requiring off-the-clock work by its hourly employees) In *Bouaphakeo v. Tyson Foods, Inc.*— an off-the-clock case — the Court explained, predominance was satisfied because all class members needed to prove was that "they are not paid for all the work they perform under Tyson's gang time compensation system. To do so, the class members would need to show that they perform work which goes unpaid…." with common evidence. 564 F. Supp.2d at 909. The court emphasized that although not all employees paid under Tyson's payroll and time-keeping system ("gang time") were treated uniformly or similarly by the policy, the court explained that "common evidence," if believed, showed that "Tyson's compensation system cannot account for even the basic or standard PPE employees need to don, doff, and clean would establish a prima facie case for the class." *Id.* Thus, the court acknowledge that while "[i]ndividual questions may exist…the court does not believe they predominate." *Id.*

**Securitas' HEROES Manual**

Plaintiffs provided this Court with a third common factual basis to certify Plaintiffs' uniform maintenance claims – Defendants' own stated admissions. In its HEROES Management Training Manual Securitas admits:

> "Employers must maintain uniforms that, although made of wash and wear materials, require: daily or special laundering due to heavy soiling or usage; ironing or dry cleaning; or patching and repairs due to nature of work. According to federal regulations, if the company does not choose to maintain the uniform itself, an associate is paid for one hour's work at the applicable minimum wage each week for maintaining the uniform."

(*See* Dkt. No. 167-8). Like it did with its own dress code policies and uniform tags, Defendant ignores this evidence in its response. The likely reason is because Securitas cannot explain away its own common policies, uniform maintenance tags and admissions that officers wearing the Hard Look or Soft Look uniform must do more than simply wash and wear their uniforms. For all these reasons, officers who wear such uniforms are ascertainable and their claims must be certified.

**ii. Alleged Variations Are Inconsequential and Not a Basis to Preclude Certification**

Defendant devotes all its efforts to nit picking Plaintiffs' compliance with Securitas policies and the uniform maintenance tags to fabricate individualized issues. In essence, Defendant argues that Plaintiffs' disobedience of its written policies is so widespread that certification is unwarranted. Defendant's efforts are legally incorrect and factually misleading.[3]

---

[3] Defendant's reference to the *Doyle*, *Williams* and *Molyneux* cases are also misleading. *Doyle* involved a completely different class of policies, uniforms and workers – fast food employees who obviously had no need to present a "military" look in connection with their job duties. *Williams* was decided without the benefit of <u>any</u> discovery. *Molyneux* was decided after only after preliminary discovery had been completed and the order was entered without prejudice.

**Legal Standard**

A common nucleus of operative fact is usually enough to satisfy the commonality requirement ...." *Rosario v. Livaditis,* 963 F.2d 1013, 1017-18 (7th Cir.1992) (citation omitted). A common nucleus of fact is said to exist where a defendant has "engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998). The fact that there is some factual variation among the class grievances will not defeat a class action. *Reed v. Advocate Health Care*, 268 F.R.D. 573, 579 (N.D. Ill. 2009). "A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions." Newberg & Conte, *Newberg on Class Actions* § 4.25, at 4–84 (3d ed. 1992).

As the Seventh Circuit has held, "the need for individualized damages determinations does not, in and of itself, require denial" of a motion for class certification. *Arreola v. Godinez,* 546 F.3d 788, 801 (7th Cir.2008). When, "there are substantial common issues that outweigh the single variable of damages," a district court "can devise solutions to address that problem." *Id.* "In any class action for damages, no two parties will ever have exactly the same claim. If simply identifying difference between the parties were enough to defeat a motion for class certification, it would be impossible for any lawsuit to proceed as a class. Thus, the task of a court reviewing a motion for class certification is to decide whether any differences identified are of the type that would make piecemeal litigation a superior vehicle for resolving each of the claims, or, to be more specific, whether the differences will make it impractical to resolve any significant issues regarding liability on a class wide basis." *Spoerle v. Kraft Foods*

6

*Global, Inc.*, 253 F.R.D. 434, 439-40 (W.D. Wis. 2008) (citing *Mejdrech v. Met–Coil Systems Corp.,* 319 F.3d 910, 911 (7th Cir.2003)).[4]

Moreover, Rule 23 allows courts to create solutions to individual damages issues. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). The solutions include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *Id.* (citing *In re Visa Check/MasterMoney Antitrust Litigation, supra,* 280 F.3d 124, 141 (2d Cir. 2001)).

In *Katsen v. Saint-Gobain*, the Western District of Wisconsin certified a Rule 23 class of workers who brought action against their employer for unpaid time donning and doffing their protective gear. *Katsen*, 556 F.Supp.2d 941, 957 (W.D. Wis. 2008). The employer argued that individual variances dominated because the employees wore different amounts of protective gear depending on their work area. *Id.* The court disagreed and stated, " [r]egardless whether plaintiffs work in different areas, on different shifts and don and doff different amounts of required protective gear, they were subject to

---

[4] *Spoerle*, 253 F.R.D. at 440(granting class certification despite individual variations in the amount of time spent donning and doffing protective gear. "Defendant is certainly correct that individual questions remain regarding the amount of equipment a particular employee wears, how long it takes the employee to put the equipment on and walk to his or her work station and whether a particular employee worked at least 40 hours (which would determine whether the time donning and doffing qualified for overtime pay). But these are not questions of liability, they are questions of damages, and 'the cases are legion in which courts have rejected arguments that differences in damages among the class members should preclude class certification.'") (quoting *Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607, 621 (W.D. Wis. 2003)

defendant's general practice of not compensating employees for donning and doffing certain protective gear..." *Id*. at 956. The court also held that the individual variances are differences in damages that can be dealt with by creating sub-groups. *Id*. at 957.

**Plaintiffs' Actual Practices**

The standard practice (*i.e.* "habits") of the majority of officers was to comply with Securitas' dress code, training materials and uniform maintenance tags by carefully cleaning, ironing and/or dry cleaning their Hard Look or Soft Look uniforms. (*See* Ex. B) Uncontested supervisor declarations and Plaintiffs' representative testimony confirm that officers overwhelmingly complied with Securitas' mandatory dress code by maintaining their assigned uniforms without pay.[5] Out of the 42 representative plaintiffs who actually worked a week for Defendant, 39 (93%) indisputably spent one hour or more each week maintaining their uniform without pay. (*See* Ex. B and *Hawkins Dkt*. 167-10 – Chart of Uniform Maintenance)[6] With the exception of Plaintiffs Jackson, Damm and Smith, officers did far more than just wash and wear their uniforms.[7] (*See* Ex. B) To highlight Defendant's factual misrepresentations, Plaintiffs have provided a side-by-side comparison of Defendant's cited examples and Plaintiffs' actual testimony. (*See* Ex. C)

---

[5] Uncontested declarations from 30 supervisors confirm that officers worked each week without pay complying with Securitas' dress code by cleaning, ironing and dry cleaning their uniforms without pay. (*See Hawkins* Dkt. No. 13-1 to 13-6)

[6] Two of the four individuals who did not separately wash, dry clean or press their own uniforms – Kathy Weigel and Sharon James did not do so because they worked for Securitas for less than one week. Nonetheless, although she never worked a shift, Ms. Weigel testified that she was required to hem her pants, which took about 10 minutes. (*See* Ex. B) Securitas selected both Kathy Wiegel and Sharon James to participate in the discovery sample precisely because it knew, that as employees who worked for less than one week, their experiences would not represent those of a typical officer.

[7] Darsemia Jackson did not maintain her own uniform because she was granted highly-unusual preferential treatment to use the dry cleaners located Securitas headquarters where she worked. (Ex. B, Jackson Dep. Tr. 36:24; 37: 1-4)

This comparison and the excerpts listed in Plaintiffs' Exhibit B confirm that except for a trivial minority, officers who wore Defendant's Hard Look or Soft Look uniforms are ascertainable and share common claims.[8]

**Defendant's Rule 30(b)(6) Witness**

Lastly, Securitas' uniform maintenance practices have been confirmed, at least in part, by Defendant's own Rule 30(b)(6) witness who testified that officers had to dry clean their Soft Look uniforms but were not reimbursed for this expense. (*Hawkins Dkt.* 167-3 at *94) Defendant derived a benefit from officers who cleaned and maintained their uniforms in compliance with its dress code. (Ex. D – Dep. of Laura Rysavy at 124). Indeed, Security officer compliance with Defendant's dress code is an integral and indispensable component part of their job. (Ex. D at 239; Dkt. No. 18-7 at *174)

**Application of Law to Security Officer Practices**

Like *Katsen* and the other cases cited above, Plaintiffs have established a common nucleus of operative facts – namely Defendant's dress code policies, common Hard Look and Soft Look uniforms, uniform maintenance tags and HEROES Manual - that all require officers to maintain their uniforms without pay. Moreover, the actual practices of the non-trivial majority of officers themselves (93%) testified they spent more than one hour per week maintaining their uniforms. These common policies and experiences outweigh Defendant's trivial variations. Because variations in damages can be addressed by creating sub-classes, if necessary, there are no procedural hurdles that justify

---

[8] Like the facts in *Spoerle*, individual questions that may remain regarding how long it takes an officer to maintain his or her uniform are questions of damages – not liability. As previously cited, the cases are legion in which the Courts have rejected arguments that differences in damages among class members should preclude certification.

Defendant's proposed piece-meal litigation.[9]   Accordingly, Plaintiffs' narrowly defined class must be certified.

### B. Defendant's Offset Argument is Not a Basis to Deny Certification

In Plaintiffs' Renewed Motion for Certification, Plaintiffs highlighted the fact that Defendant's meal period policies prohibit them from leaving their posts for meal breaks and instead require them to remain "on duty" when they ate a meal.[10] (*See* Dkt. No.167 at *6-9)  Plaintiffs also pointed out the critical and legally significant fact that Defendant failed to record officer meal periods.  When faced with this indisputable evidence of a common scheme, Defendant's response is silence.[11]   Defendant has the burden of proof on this defense, yet it has failed to take any steps to shoulder its burden.  Nonetheless, Defendant has asked this Court to set a new standard and deny certification based on its alleged off-set defense.[12]  The hypocrisy of Defendant's argument is clear – for it to be successful it would have to show that a non-trivial percentage of officers regularly violated Defendant's own policy – something they could not and did not do.

---

[9] Defendant's proposal would cause significant procedural difficulties.  If the Court certifies the introductory training claim, but not the others, the result would be one class action trial (on the training/orientation claims) and hundreds of separate individual trials on the remaining claims for uniform maintenance and pre-shift work.  Such a scenario would be inefficient, unfair and legally irreconcilable.

[10] By requiring officers to remain on duty, such meal periods are by definition compensable.

[11] Defendant did not bother to address its policies or complete dearth of records in its response.

[12] Essentially, Defendant is asking this Court to create new precedent that would permit companies to avoid certification by implementing written policies requiring workers to remain on duty during meal periods, pay them for that time (as is required by law) and then use such pay as an offset against any employee claims for any other unpaid wages.  Such a ruling would contradict the purpose of Rule 23 and permit employers to receive double credit for paid meal periods – once for the period itself and a second time for any other unpaid work.

Moreover, Class certification is not an inquiry into the ultimate merits or damages. While the court is entitled to examine the merits to determine whether the requirements of Rule 23 have been satisfied, the court should not decide class certification based on its view of who will prevail on the merits. Here, Securitas has asked this Court to go even beyond a merits inquiry and calculate damages based on its alleged offset defense. Because cases are legion in which courts have rejected arguments that differences in damages among the class members should preclude class certification, Plaintiffs' renewed motion must be granted.

### i. Securitas Officers Were Not Relieved From Duty For Meal Periods

Defendant's stated policies, requiring officers to remain on duty while eating a meal, implicate its actual or constructive knowledge that such compensable meal periods regularly took place.[13] The likely and logical reason why Defendant paid for such meal periods is because it was required to do so by law.[14]

The standard practice of the officers was to comply with Defendant's "On Duty Meal Period Agreement" and remain on post. With the exception of a few,[15] representative testimony demonstrates that officers could not leave their posts or go off

---

[13] The Securitas handbook explicitly states that **"most post assignments do not allow officers to leave the job site for meal periods."** (*Hawkins Dkt*. 167-19 at *4) The Securitas "On Duty Meal Period Agreement" requires all officers to "agree to have an **on-duty** meal period that shall be compensated by Securitas." (*Hawkins Dkt*. 167-19) Defendant's VP of Human Resources testified that she was not aware of any Securitas policies that provide officers with uninterrupted meal breaks. (*Hawkins Dkt*. 167-16 at 245-246)

[14] The test for compensability under the FLSA is whether the employer suffered or permitted the work to be done. 29 U.S.C. §203(g)

[15] It appears that the only officers potentially relieved from duty for meal breaks are a small subset of K-9 officers. As of July, 2008, Securitas only employed 31 K-9 officers. (*See* Dkt. No. 40) The experiences of less than 1% of Securitas' officers should not outweigh the common claims of over 99% of Securitas officers.

11

duty when taking a meal break. (*See* Dkt. No. 167 at *8)  While many officers stated they had time to eat a meal, virtually all of them did so while on duty at their assigned post. (*Id*.)  Their testimony is consistent and affirms Defendant's written uniform policies on meal breaks – that they must be taken <u>while on duty and at the job site</u>.[16]

### ii. Defendant is Prohibited From Asserting Meal Periods as an Offset as a Matter of Law Because It Has Failed to Record Such Periods

Remarkably, Defendant asks this Court to conclude that time it was *required* to pay by law can be used by an employer to off-set other unpaid work.   Plaintiffs dispute this contention and the Court's resolution of the issue of whether meal periods can be used as an offset in the absence of any records is clearly a common legal question.

The IMWA requires employers to maintain records of the hours worked each day, in each week by each employee. 820 ILCS 105/8.  <u>All</u> time records maintained by Securitas show exactly the opposite of what it claims now: that officers **worked uninterrupted** time from their scheduled start until their scheduled end time.  <u>No breaks</u> are reflected on any of Defendant's time records.   Accordingly, there is no evidentiary basis for Defendant to claim any offsets.

Lastly, it is critical to note that for a set-off to apply, Defendant would also have to prove that the purported meal periods were at least 20 minutes in length and uninterrupted – which it cannot do.[17]

---

[16] It is important to note that with the exception of certain K-9 officers, Larry Smith and Joella Miller, Defendant has not identified any officers who testified they were relieved from duty and provided uninterrupted meal breaks of 30 minutes or more. (*See* Dkt. No. 172)  Plaintiffs have pointed out other Defendant's other misleading statements in a side-by-side comparison attached as Exhibit E.

[17] Breaks of 20 minutes or less are considered hours worked and therefore must be paid under the FLSA. 29 C.F.R. §785.18.  Accordingly, even if Plaintiffs took 15-20 minute breaks off duty and off site, they must be compensated and cannot be used as an offset.

### iii. Defendant's Offset Argument is a Damages Issue That Does Not Preclude Certification.

Defendant's argument that an offset should apply presumes an initial finding of damages. Essentially, Defendant is asking this Court to apply an unknown offset (due to Defendant's lack of meal period records) to Plaintiffs' yet to be proven damages. While Defendant may be able to show an offset applies to a trivial minority of officers, it can only due so during the damages portion of the trial. However, we are not at trial. We are at the certification stage and Courts have universally held that damages are not a basis to preclude certification.[18] Moreover, a class may include some parties who are ultimately determined not to have been harmed:

> A class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification, despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct.

*Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.).

Courts have routinely certified classes in which some or all of the damages are calculated on an individualized basis. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th

---

[18] *E.g.*, *VISA Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139 ("[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *In re FedEx Ground Package System, Inc., Employment Practices Litig.*, 2007 WL 3027405, *13 (N.D. Ind. Oct. 15, 2007) ("While individual issues may exist in determining the damages suffered, 'it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.'"). *Accord*, *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796, 798 (10th Cir. 1970); *Blackie v. Barrack*, 524 F.2d at 905; *Walton v. Franklin Collection Agency, Inc.*, 190 F.R.D. 404, 412 (N.D. Miss. 2000); *Liles*, 231 F.R.D. at 575; *Spoerle*, 2008 WL 2002221, at *6; *Mendec*, 232 F.R.D. at 92-93.

Cir. 2010) ("A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individualized assessments."); *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 412 (N.D. Ill. 1987) ("Traditionally... the courts have not allowed individual questions of damages to prevent class certification."). *Spoerle*, 253 F.R.D. at 440(Granting class certification despite individual variations in the amount of time spent donning and doffing protective gear.   "Defendant is certainly correct that individual questions remain regarding the amount of equipment a particular employee wears, how long it takes the employee to put the equipment on and walk to his or her work station and whether a particular employee worked at least 40 hours (which would determine whether the time donning and doffing qualified for overtime pay). But these are not questions of liability, they are questions of damages, and 'the cases are legion in which courts have rejected arguments that differences in damages among the class members should preclude class certification.'") (quoting *Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607, 621 (W.D. Wis. 2003)

For an offset to apply, we would first need to know the amount of unpaid time worked by class members – which is a damages issue.  Then Securitas would need to prove whether there is a basis for an off-set and if so, the amount for such an off-set. Specifically, Securitas would have to identify which officers violated their Meal Period Agreements and actually took uninterrupted meal periods of 30 minutes or more. Securitas is unable to do so because it has not complied with its legal obligations and maintained records of any alleged meal periods.  More importantly, the amount of unpaid time worked and any offset for meal periods goes to damages, which, as stated above, is

not a basis to preclude certification. Accordingly, Defendant's offset argument must be rejected.

### C. Defendant's De Minimis Argument Does Not Preclude Certification

Securitas also claims that pre-shift work was not required to be compensated because it was *de minimis.* In this case, the evidence establishes that class members, on average, spent 2.6 hours per week separately washing, ironing/pressing and/or dry cleaning their uniforms. (*See* Dkt. No. 167-10)

In *Kellar v Summit Seating Inc.*, 2011 WL 6256181 (7th Cir, Dec. 14, 2011), the Seventh Circuit outlined the criteria used in determining whether work is *de minimis*:

> When evaluating whether work performed by an employee is de minimis, courts typically consider the amount of time spent on the extra work, the practical administrative difficulties of recording additional time, the regularity with which the additional work is performed, and the aggregate amount of compensable time.

*Id.* at *5. The defendant has the burden of proof showing that the time was *de minimis*. *Spoerle v. Kraft Foods Global, Inc.,* 527 F.Supp.2d 860, 868 (W.D. Wis. 2007).

Applying these factors, the Fourth Circuit has held that work which required 10 minutes per day was not *de minimis*, especially when viewed in the aggregate:

> Each of these employees was being paid at a rate of ten dollars per hour, and each would be entitled to compensation for 10.204 minutes of work per day. Applying these figures to an annual work schedule of fifty weeks, the amount of compensable time per employee is about 42.5 hours per year, which amounts to compensation of about $425 per employee per year. We conclude that this annual amount per employee is significant for an employee earning ten dollars per hour, because that annual amount represents a full week's wages.

*Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 374 (4th Cir. 2011). Moreover, a defendant must show that it would not be practical to track this time: "To trigger the *de minimis* exception, an employer must show not merely that the time involved is minimal

but that it would be difficult to measure the time in light of the realities of the industrial world." *Kasten,* 556 F.Supp.2d at 954. Thus in *Spoerle*, the court stated that activities that time much less than 10 minutes are compensable so long as it is practical to track the time. 527 F.Supp.2d at 868-69. As the *Spoerle* court further explained,

> when providing compensation for a task imposes no additional burden on the employer, there is no justification for denying the employee compensation for that task, regardless how fast the task was performed. Any other rule would deny employees "the just remuneration guaranteed them by the Act for contributing their time, liberty and strength primarily for the benefit of others." After all, many jobs could be divided up into tasks that take only a few minutes a piece. Taken to its logical conclusion, a "de minimis" rule that focuses only on time could swallow up an entire shift.

527 F.Supp.2d at 869 (citations omitted).

While the Fourth Circuit found that 10 minutes of work every day was not *de minimis* in *Perez*, the Securitas officers are working an additional hour or more per week maintaining their uniforms. Like the workers in *Perez*, the class members here earn about $10 an hour and the extra pay would be very significant to them. Securitas cannot satisfy the requirements of the *de minimis* defense.

## **CONCLUSION**

As the Court stated on October 18, 2011, there is a sufficient degree of commonality as to Plaintiffs' uniform maintenance claims. (*See* Dkt. No. 167-1 at *6-7) Plaintiffs who wore Defendant's Hard Look or Soft Look uniforms are easily ascertainable by using Defendant's own records. All were subject to Defendant's common dress code policies which required them to perform special maintenance. All wore similar uniforms with maintenance tags that required special care. The non-trivial majority (93%) complied with Defendant's dress code policies and the maintenance tags

by separately washing, pressing/ironing and/or taking their uniforms to the dry cleaners without pay. This Court must take note of Defendant's response to Plaintiffs' overwhelming evidence – silence. Defendant's claimed variations are irrelevant, misleading and inconsequential as they apply to the trivial minority (7%). Lastly, Defendant's offset argument fails on the facts and as a matter of law. Namely its alleged defense contradicts its own stated policies, lacks any evidentiary support (no time records) and is a damages issue which courts have universally held is not a basis to preclude certification. For all these reasons and the practical benefits of trying Plaintiffs' claims in a single proceeding, Plaintiffs' renewed motion must be granted.

Dated: January 13, 2012                         Respectfully submitted,


By: */s/ Ryan F. Stephan*
Ryan F. Stephan
James B. Zouras
Stephan Zouras, LLP
205 N. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
312-233-1550

Marvin A. Miller
Matthew E. Van Tine
Miller Law LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
312-332-3400

Thomas M. Ryan
Law Offices of Thomas M. Ryan, P.C.
35 E. Wacker Drive, Suite 650
Chicago, IL 60601
312-726-3400

**ATTORNEYS FOR THE PLAINTIFFS**