IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE HAWKINS, DARSEMIA JACKSON, and MERIJA WALLACE, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | The Honorable Judge Gary Feinerman |
| v. | ) ) ) ) | No. 09 C 3633 |
| SECURITAS SECURITY SERVICES, USA INC., | ) ) ) ) ) | |
| Defendant. | ) | |

## DEFENDANT SECURITAS SECURITY SERVICES USA, INC'S RULE 56.1(a) STATEMENT OF UNCONTESTED FACTS

Defendant, Securitas Security Services USA, Inc. ("SUSA"), by its attorneys, and pursuant to Local Rule 56.1, submits its statement of uncontested facts.

1.     Stephanie Hawkins ("Hawkins") is a resident of Cook County, Illinois.  DKT 1-2 at ¶ 1.

2.     Darsemia Jackson is a resident of Cook County.  DKT 1-2 at ¶ 2.

3.     SUSA provides security services to businesses throughout the State of Illinois. DKT 1-2 at ¶ 5.

4.     The Court has subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 216(b), which provides that suit under the Fair Labor Standards Act ("FLSA") "may be maintained against any employer . . . in any Federal or State court of competent jurisdiction." DKT 1-2 at ¶ 34.

5.      Stephanie Hawkins ("Hawkins") worked for SUSA from December 2006 to August 2007.  Hawkins Dep. at 31-32.  A copy of Hawkins' deposition transcript is attached hereto as Exhibit A.  *See also* Hawkins worked hours report.  A copy of Hawkins' worked hours report is attached as Exhibit B.

6.      Hawkins worked a total of thirty-four weeks for SUSA.  Ex. B.

7.      Hawkins worked less than forty (40) hours in twenty-four of the weeks she worked at SUSA.  Ex. B.

8.      Hawkins was paid overtime in eight of the weeks she worked at SUSA.  Ex. B.

9.      Hawkins was paid double time in five of the weeks she worked at SUSA.  Ex. B.

10.     During her employment with SUSA, Hawkins was a member of the SEIU, Local 1.  Ex. A at 15.

11.     Hawkins signed an acknowledgement that she read and understood everything in the handbook.  Ex. A at 157-59 and Ex. 18 to Ex. A.

12.     Hawkins received, read, and complied with the policies contained in SUSA's Handbook.  Ex. A at 157-59 and Ex. 18 to Ex. A.

13.     The SUSA Security Officer Handbook provides:

> Due to the critical nature of your job, and the need to staff security posts at all times, you are to report to work as scheduled.  You will be notified of the starting and ending times of your workday and break periods, if applicable.  **You are to be at your post and ready to begin work at your scheduled start time.**  If you do not report for duty or call to report an absence or late arrival, you will unfairly inconvenience a fellow employee, create scheduling problems or leave a client facility unprotected.  You are considered late if you are not at your work area at the starting time of your shift.

Ex. 19 at 35-36 (emphasis in original) to Ex. A.

14.     Hawkins was required to arrive at her post at her scheduled start time - not before.  Ex. A at 68; *see also* Ex. 9 to Ex. A.

15.     Hawkins understood that SUSA policy required her to be at her post and ready to begin work at her scheduled start time.  Ex. A at 68; *see also* Ex. 9 to Ex. A.

16.     Hawkins understood that pursuant to SUSA policy she would be considered late if she was not at her working area at the starting time of her shift.  Ex. A at 68; *see also* Ex. 9 to Ex. A.

17.     In relation to a Counseling and Corrective Action Report she received for being five minutes tardy for the start of her scheduled shift at 6:30 p.m., Hawkins testified as follows:

> Q:     And underneath description incident and corrective measure it states, quote:
>
> "SO Hawkins was scheduled to arrive for duty at 1830 [6:30 pm]. SO Hawkins was tardy for duty arriving at 1835.  SO Hawkins has been advised she must arrive on time for duty," period, end quote.
>
> Did I read that correctly?
>
> A.      Yes, sir.
>
> Q.      And beneath Employee Comments it states, quote:
>
> "I, SO Stephanie Hawkins, am disputing the CA's accusation that I was late to Damen Milwaukee station.  I received a ride just for that reason so I would not be late.  I entered the station at exactly 6:30 p.m. and was not late."  Period end quote.
>
> Did I read that correctly?
>
> A.      Yes, sir.
>
> Q.      And next to that are the initials SNH.  Those are your initials?
>
> A.      Yes, sir.
>
> Q.      Did you write this comment?
>
> A.      Yes, sir, and I didn't sign it because I didn't feel that this was valid, and I knew that on this occasion that I was on time and my daughter was still in the hospital and sometimes the train -- I

could see that the train was becoming a problem, so when I could I would get a ride to the Damen station because it was up north and Children's Memorial was kind of close, so I would get a ride so I wouldn't be late due to any train problems or anything like that.

Q.      So you arrived at exactly 6:30 on this day?

A.      Yes, sir, I arrived for my schedule time.

Q.      And that was the time you were supposed to be there; is that right?

A.      Yes, sir, my scheduled time.

Ex. A at 67-68; *see also* Ex. 9 to Ex. A.

18.     Hawkins was never reprimanded or disciplined for showing up at the start of her scheduled shift.  Ex. A at 45-46, 169-70.

19.     Hawkins was never reprimanded or disciplined for showing up less than 10-15 minutes before the start of her scheduled shift.  Ex. A at 45-46, 169-70.

20.     To Hawkins, being "late" meant showing up after the start of her scheduled shift. Ex. A at 45-46, 169-70.

21.     During her deposition, Hawkins testified as follows:

Q.      Were you ever reprimanded for showing up less than 10 to 15 minutes prior to the start of your shift?

A.      No, sir.

Q.      Were you ever reprimanded for showing up after the start of your scheduled shift?

A.      Yes.  Are you referring to showing up late?

Q.      Showing up late, late is after the start of your shift, right?

A.      Yes, sir.

Ex. A at 45-46.

22.     Hawkins is unaware of any written SUSA policy that required security officers to report fifteen minutes before the employee's scheduled shift.  Ex. A at 13-15.

23.     Hawkins is unaware of any written SUSA policy that required her to perform duties prior to her scheduled shift.  Ex. A at 13-15.

24.     No supervisor ever told Hawkins that she had to arrive fifteen minutes before her scheduled shift.  Ex. A at 13-15.

25.     She claims that some unidentified co-workers at her "same level of command" or "other security guards" told her that there was an "unwritten rule" that she needed to arrive 10 to 15 minutes before the start of her scheduled shift.  Ex. A at 13-15, 170.

26.     When she did arrive before the start of her scheduled shift, Hawkins could engage in personal activities, *i.e.* activities not primarily for the benefit of SUSA.  Ex A at 42.

27.     If she actually worked outside of her scheduled shift, Hawkins was required to report such time to SUSA and would be paid for such time.  Ex. A at 165.

28.     On those occasions when she notified SUSA that she was not properly paid, SUSA always paid for the time Hawkins requested.  *Id.* at 11-12.

29.     Hawkins did not notify her supervisor that she was working prior to the start of her scheduled shift.  Ex. A at 167-168.

30.     Hawkins did not notify her supervisor that her time sheets were inaccurate.  Ex. A at 168.

31.     During her deposition, Hawkins testified as follows:

> Q.     And you didn't report to management that you were working 10 to 15 minutes before the start of your shift -- no?
>
> A.     No, sir.

> Q.      You didn't report to management that the time on the time
> sheets was inaccurate?
>
> A.      No, sir.

Ex. A at 167-168.

32.      Hawkins never informed SUSA that she had been paid improperly, other than the

four times she brought it to SUSA's attention and was properly paid as a result. *Id.* at 172.

33.      On December 21, 2006, Hawkins received a counseling and corrective action

report for arriving tardy "at Forest Park at 2156 hrs. as actual reporting time was 2130 hrs."  Ex.

A at 31-33 and Ex. 2 to Ex. A.

34.      On January 31, 2007, Hawkins received a counseling and corrective action report

for arriving for duty at 2140 hours when her scheduled start time was 2100 hours.  Ex. A at 53-

56 and Ex. 5 to Ex. A.

35.      On February 3, 2007, Hawkins received a counseling and corrective action report

for arriving for duty at 1902 hours when her scheduled start time was 1830 hours.  Ex. A at 56-

58 and Ex. 6 to Ex. A.

36.      On February 7, 2007, Hawkins received a counseling and corrective action report

for arriving for duty at 2120 hours when her scheduled start time was 2100 hours.  Ex. A at 58-

62 and Ex. 7 to Ex. A.

37.      On February 25, 2007, Hawkins received a counseling and corrective action

report for arriving for duty at 1842 hours when her scheduled start time was 1830 hours.  Ex. A

at 62-66 and Ex. 8 to Ex. A.

38.      On March 4, 2007, Hawkins received a counseling and corrective action report for

arriving for duty at 1835 hours when her scheduled start time was 1830 hours.  Ex. A at 66-68

and Ex. 9 to Ex. A.  In response, Hawkins wrote that she was disputing "the CA's accusation that

she was late to Damen/Mil Station. I received a ride just for that reason – so I would not be late. I entered the station at exactly 6:30 p.m. and was not late." *Id.*

39.     On March 16, 2007, Hawkins received a counseling and corrective action report for arriving for duty at 2340 hours when her scheduled start time was 2100 hours. Ex. A at 68-72 and Ex. 10 to Ex. A.

40.     On April 5, 2007, Hawkins received a counseling and corrective action report for arriving for duty at 2240 hours when her scheduled start time was 2200 hours. Ex. A at 73-76 and Ex. 11 to Ex. A.

41.     On January 7, January 27, May 22, June 18, and June 28, 2007, Hawkins received a counseling and corrective action report for improper call offs. Ex. A at 47-49, 76-89 and Ex. 3, 4, 12-14 to Ex. A.

42.     On September 26, 2006, Hawkins signed a contingent offer letter. Ex. A at 133-34 and Ex. 17 to Ex. A.

43.     Hawkins understood that Exhibit 17 to her deposition was a contingent offer of employment from SUSA. Ex. A at 133-34 and Ex. 17 to Ex. A.

44.     The contingent offer letter provided that: "The pre-assignment introduction completes your application for employment and is a requirement that must be met before we begin training you at your account. This is generic security officer training. This is not paid training. It is considered the final portion of your application/interview process." Ex. A at 138-139 and Ex. 17 to Ex. A.

45.     Hawkins did not have a permanent employee registration card ("PERC card") when she applied for employment at SUSA. Ex. A at 91, 95-96.

46.     Hawkins understood that she could use her PERC card to work for other security companies.  Ex. A at 96.

47.     The training Hawkins received from SUSA occurred in a classroom.  Ex. A at 131-33.

48.     Hawkins did not displace any SUSA workers during her training.  Ex. A at 131-33.

49.     Hawkins did not perform any security guard duties during her training.  Ex. A at 131-33.

50.     Hawkins did not perform any duties for SUSA clients during her training.  Ex. A at 131-33.

51.     Hawkins completed the 20-hour pre-employment training and received a certificate of completion on October 4, 2006.  Ex. C.

52.     SUSA provides pre-employment training to job applicants free of charge.  Brad Lauer Declaration at ¶15.  A copy of Lauer's Declaration is attached hereto as Exhibit D.

53.     While working for Securitas, Hawkins was paid $9.10 per hour.  Ex. B.

54.     Hawkins estimated that she spent four hours per week maintaining her uniform including between one hour and twenty minutes and two hours and forty minutes per week ironing her uniform.  Ex. 20 at ¶ 15 to Ex. A; Ex. A at 125.

55.     Hawkins testified that the manner in which she cared for her uniform depended upon individualized factors, *i.e.* medical issues and her personal preferences.  Ex. A at 112-114, 171-72.

56.     Hawkins is unaware of any SUSA employee being disciplined or reprimanded for not pressing his or her uniform.  Ex. A at 126.

57.     SUSA's handbook provides that it is an employee's "responsibility to make sure the uniform is kept clean and neat." Ex. 19 at 41 to Ex. A.

58.     CTA rail station security guards self-report their time to their assigned supervisors. Brown Declaration at ¶¶ 5-8. A copy of the Brown Declaration is attached as Exhibit E.

59.     CTA applicants are not considered employees until they complete pre-employment training. Ex. E at ¶¶ 14-15.

60.     The CTA 20-hour security officer training program is conducted at the branch office. Ex. E at ¶ 17.

61.     The CTA 20-hour security officer training program incorporates the 20-hours of training for new security officers that is mandated by the state of Illinois. Ex. E at ¶ 17.

62.     During the CTA 20-hour security officer training program, trainees do not have any contact with clients. Ex. E at ¶ 18.

63.     During the CTA 20-hour security officer training program, trainees do not perform any work for SUSA or its clients. Ex. E at ¶ 18.

64.     Trainees wear regular clothes, not the uniforms worn by CTA security guards. Ex. E at ¶ 18.

65.     Basically, trainees sit in a classroom and learn how to be security guards. Ex. E at ¶ 18.

66.     In early 2004, an IDOL administrative law judge held that SUSA was not required to compensate non-employee security guard applicants for attending SUSA's 20-hour pre-employment training course. Joan Eagle Declaration at ¶ 5. A copy of the Joan Eagle declaration is attached as Exhibit F.

67.     The 20-hour state mandated training is available for a fee through outside training sources.  For example, Chicago's Discovery Center and the PTC Security Training Company in Chicago offer the 20-hour training course and PERC application process for fees ranging from $100-$125.  *See* Exhibit G attached hereto.

68.     Except for the tie, the CTA uniforms are wash and wear.  Ex. E at ¶ 23.

69.     The Downtown Chicago Branch – CTA does not require employees to iron their uniforms.  Ex. E at ¶ 25.

Dated: January 18, 2012                         Respectfully submitted,

                                                SECURITAS SECURITY SERVICES USA, INC.


                                        By:     /s/ Joel C. Griswold
                                                One of Its Attorneys

John T. Roache
Melissa A. Siebert
Joel C. Griswold
K&L GATES LLP
Three First National Plaza
70 West Madison Street, Suite 3100
Chicago, Illinois  60602
Telephone: 312.372.1121
Facsimile: 312.827.8093

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a true and correct copy of the above and foregoing Defendant's Securitas Security Services USA, Inc.'s Rule 56.1(a) Statement of Uncontested Facts was served this 18th day of January, 2012, via the ECF system for the United States District Court for the Northern District of Illinois, upon the following:

James B. Zouras
Ryan F. Stephan
Stephan Zouras, LLP
205 N. Michigan, Suite 2560
Chicago, Illinois 60601

Marvin A. Miller
Matthew E. Van Tine
Miller Law LLC
115 S. LaSalle, Suite 2910
Chicago, Illinois 60603

Thomas M. Ryan
Law Offices of Thomas M. Ryan, P.C.
205 N. Michigan, Suite 2560
Chicago, Illinois 60601

/s/ Joel C. Griswold

CI-9265726 v1