UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHANIE HAWKINS and DARSEMIA JACKSON,<br>individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SECURITAS SECURITY SERVICES USA, INC.,<br><br>Defendant. | )<br>)<br>)   09 C 3633<br>)<br>)   Judge Feinerman<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Stephanie Hawkins, Darsemia Jackson, and Merija Wallace brought this suit against Securitas Security Services USA, Inc. ("Securitas"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq*. The complaint alleges that Plaintiffs—who worked as hourly, non-exempt uniformed security officers—performed three categories of off-the-clock work: (1) mandatory training and orientation; (2) work before and after their scheduled shifts; and (3) uniform cleaning and maintenance. The court dismissed Wallace as a party plaintiff on judicial estoppel grounds, 2011 WL 2837269 (N.D. Ill. July 18, 2011), and denied Securitas's motion to dismiss the IMWL claim for lack of subject matter jurisdiction, 2011 WL 5122679 (N.D. Ill. Oct. 28, 2011). The court certified the IMWL training/orientation claim for class treatment, but declined class certification for the IMWL pre/post-shift work and uniform maintenance/cleaning claims. 280 F.R.D. 388 (N.D. Ill. 2011). Securitas has moved for summary judgment on Hawkins's training/orientation claim under the FLSA and the IMWL. Doc. 175. The motion is denied.

-1-

**Background**

The facts at this stage are stated as favorably to Hawkins, the non-movant, as permitted

by the record and Local Rule 56.1. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

Securitas provides security services to businesses throughout the State of Illinois. Doc.

205 at ¶ 3. On September 26, 2006, Securitas gave Hawkins two documents. The first

document, titled "Introduction Class Guidelines," directed Hawkins to arrive for an "introduction

class" at 7:45 a.m. on October 3, 2006, stated that "[i]ndividuals arriving after 8am will not be

allowed to participate in introduction class and the offer of employment is rescinded," and said:

"We are excited about you becoming part of the Securitas team and look forward to seeking you

on October 3, 2006." Doc. 221 at ¶ 4. Hawkins signed the document, with her signature

"indicat[ing] [her] understanding of and agreement to the policies listed above for attendance at

the (2) day introduction class." Doc. 205-2 at 5.

The second document, a contingent offer of employment, stated: "Welcome to Securitas

Security Services USA, Inc., the leading contract security provider in the United States! We are

pleased to extend to you a contingent offer of employment, provided you successfully complete

all pre-employment requirements, inclusive of a background investigation and drug test." Doc.

205 at ¶ 42; Doc. 205-2 at 2. The document noted that Hawkins was scheduled for "pre-

assignment introduction" on October 3–4, 2006, and said: "The pre-assignment introduction

completes your application for employment and is a requirement that must be met before we

begin training you at your account. This is generic security officer training, this is not paid

training. It is considered the final portion of your application/interview process." *Ibid.* The

document stated that Hawkins's "Job Site" was the Chicago Transit Authority, that her "Starting

Wage" was $9.10, and that her "Branch Manager" was Tim Brower. *Ibid*. Hawkins signed the document below a line stating: "Your signature below is your acceptance of this contingent offer of employment." *Ibid*.

Hawkins attended the introduction class on October 3–4, 2006, in a classroom at a Securitas branch in Chicago. Doc. 221 at ¶ 1; Doc. 205 at ¶¶ 47-48. The class consisted of Securitas orientation and Securitas's proprietary ACT I and ACT II training. Doc. 221 at ¶ 1. (ACT is an acronym for "advanced certification training." *Id*. at ¶ 6.) Securitas used the ACT I program to train officers in Illinois, Minnesota, Ohio, and other States. *Ibid*. The ACT I and ACT II program included generic subjects necessary to obtain a Permanent Employment Registration Card ("PERC"), which an individual must have to work as a security guard in Illinois; the program also included many Securitas-specific topics that were not required to obtain a PERC. *Id*. at ¶¶ 7, 26. Hawkins completed the ACT I and ACT II final exams on October 4, 2006. *Id*. at ¶ 5; Doc. 205-2 at 3-4. Hawkins did not understand that her ACT I and ACT II training was unpaid. Doc. 221 at ¶ 8; Doc. 205-1 at 36-37. Hawkins was not paid for attending the two-day introduction class.

Hawkins did not have a PERC when she applied for employment at Securitas. Doc. 205 at ¶ 45. Hawkins authorized Securitas to deduct $100 from her paychecks to cover the PERC's cost. Doc. 221 at ¶ 25. Hawkins understood that she could use her PERC to work for other security companies. Doc. 205 at ¶ 46. Hawkins applied for her PERC the day she completed her ACT I and ACT II final exams. Doc. 221 at ¶ 11.

During the classroom training on October 3–4, 2006, Hawkins did not displace any Securitas workers or perform any security guard or duties for Securitas clients. Doc. 205 at

¶¶ 48-50. Securitas benefits from ACT training provided to its officers. Doc. 221 at ¶ 14. Hawkins received some, but not all, of her ACT training during the introduction class. Doc. 205 at ¶ 47; Doc. 205-1 at 34. Hawkins completed her training during normal business hours. Doc. 221 at ¶ 15.

As part of the orientation component of the introduction class, Hawkins signed a series of Securitas documents, each with a signature block reading "Employee Signature" or "Security Officer Signature." *Id*. at ¶ 18. The documents included the Securitas Security Officer Handbook Acknowledgment, Doc. 205-2 at 12; the Securitas Bloodborne Pathogens Notification to Employees, *id*. at 8; the Securitas Consent to Drug Test, *id*. at 9; the Securitas Drug-Free Workplace Policy, *id*. at 10; the Securitas Harassment and Sexual Harassment Policy Notification, *id*. at 13; the Securitas Hazard Communications Notification to Employees, *id*. at 14; and the Securitas Acknowledgment of Telephone Enrollment, *id*. at 15. Hawkins also completed and signed a W-4 "Employee's Withholding Allowance Certificate," *id*. at 11, and authorized Securitas to withhold $50 from her pay for union dues, *id*. at 20. During orientation, attendees meet with their branch manager or scheduler to receive their post assignment, get a photo ID, complete new hire paperwork, obtain and review the Securitas handbook, receive their Securitas uniform, receive and review benefit information, and begin assignment training. Doc. 221 at ¶ 19; Doc. 205-2 at 1, 19.

The Securitas HEROES Management Training manual states: "On-the-job training generally counts as compensable work time. Examples include … mandatory requirements to take the ACT courses during the HEROES Hiring Process." Doc. 221 at ¶ 9; Doc. 205-29 at 1. A Securitas PowerPoint presentation states: "Training time is considered hours worked, and

must be paid, unless all of the following factors are met: [1] Attendance is outside the employee's regular working hours; and [2] Attendance is *truly* voluntary; and [3] The employee does not perform any productive work while attending; and [4] The program, lecture, or meeting is not directly related to the employee's job." Doc. 221 at ¶ 3; Doc. 205-24 at 1. The same document also states:

> Determination of what is compensable depends on unique, particular facts:
>
> – If it is mandatory, it's compensable.
>
> – If it occurs during the employee's normal work shift, it's compensable.
>
> – If employee believes job depends on training, it's compensable.
>
> – Generally, if training benefits employer, it's compensable.
>
> – Training that is Company specific (*e.g.*, for benefit of Company, payroll practices, safety etc.), it's compensable.

Doc. 221 at ¶ 3; Doc. 205-24 at 2.

The Securitas handbook states: "Your first 90 days of employment are considered an Introductory period. During this time you will participate in an orientation to Securitas USA and any training required for you to perform your job duties." Doc. 221 at ¶ 17; Doc. 205-34 at 7. In a July 2008 email, Securitas Area Recruiter Stacy Gonzalez said that one of her duties was to "[c]oordinate with orientation trainer to make sure new hires arrive on time and compete orientation." Doc. 221 at ¶ 16; Doc. 207-9. Securitas's timekeeper for the Chicago Transit Authority account, to which Hawkins was assigned, testified that orientation is required of all new officers after they are hired. Doc. 221 at ¶ 21; Doc. 205-20 at 2. The timekeeper also

testified that the orientation takes about four hours and that she is not aware of attendees receiving compensation for time spent at orientation. Doc. 221 at ¶ 21; Doc. 205-20 at 2.

## Discussion

Hawkins claims that Securitas's failure to pay her for the time she spent in training and orientation violates the FLSA and the IMWL. Because the IMWL incorporates FLSA standards, there is no need to separately analyze the statutes. *See* 56 Ill. Admin. Code § 210.120 ("For guidance in the interpretation of the [IMWL], the Director [of the Illinois Department of Labor] may refer to the Regulations and Interpretations of the Administrator, Wage and Hour Division, U.S. Department of Labor, administering the [FLSA]."); *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010) ("The overtime provision of the Illinois Minimum Wage Law, 820 ILCS 105/4a(1), is parallel to that of the FLSA, and Illinois courts apply the same principles … to the state provision."); *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) ("if the system used by Sysco to compensate Condo for working overtime complies with the FLSA, it also complies with [the IMWL]"); *Haynes v. Tru-Green Corp.*, 507 N.E.2d 945, 951 (Ill. App. 1987) (holding that the IMWL overtime provision "parallels" the analogous FLSA provision); *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011).

The standard governing whether Securitas had to pay Hawkins for the time spent in training and orientation turns on whether Hawkins was a Securitas employee at the time or merely a trainee. A *trainee's* entitlement to wages for time spent in training is governed by a six-part test developed by the Department of Labor and derived from *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), which asks whether:

(1)    the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;

(2)    the training is for the benefit of the trainee;

(3)    the trainees do not displace regular employees, but work under close observation;

(4)    the employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded;

(5)    the trainees are not necessarily entitled to a job at the completion of the training period; and

(6)    the employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

*Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1025-26 (10th Cir. 1993) (citing Wage & Hour Manual (BNA) 91:416 (1975)); *see also Kaplan v. Code Blue Billing & Coding, Inc.*, 2013 WL 238120, at *2 n.2 (11th Cir. Jan. 22, 2013) (same); *McLaughlin v. Ensley*, 877 F.2d 1207, 1208 n.1 (4th Cir. 1989) (same); *Atkins v. Gen. Motors Corp.*, 701 F.2d 1124, 1127-28 (5th Cir. 1983) (same).  An *employee's* entitlement to compensation for time spent in training is governed by this four-part test:

Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:

(a)    Attendance is outside of the employee's regular working hours;

(b)    Attendance is in fact voluntary;

(c)    The course, lecture, or meeting is not directly related to the employee's job; and

(d)    The employee does not perform any productive work during such attendance.

29 C.F.R. § 785.27; *see Fowler v. Incor*, 279 F. App'x 580, 598 (10th Cir. 2008); *Chao v. Tradesmen Int'l, Inc.*, 310 F.3d 904, 907-08 (6th Cir. 2002); *Kosakow v. New Rochelle Radiology Assocs.*, *P.C.*, 274 F.3d 706, 721 (2d Cir. 2001).

Hawkins argues that she was an employee at the time she underwent training and orientation on October 3–4, 2006, and therefore that the four-part test applies, while Securitas argues that Hawkins was merely a trainee, and therefore that the six-factor test applies. In its summary judgment motion, Securitas argues only that Hawkins fails the six-part test applicable to trainees; it does not attempt to show that Hawkins fails the four-part test applicable to employees. Accordingly, if the record would permit the conclusion that Hawkins was an employee rather than a trainee at the relevant time, summary judgment must be denied, as an employee need not satisfy the six-factor test to prove an entitlement to wages for time spent in training and orientation. *See Farmer v. Ottawa Cnty.*, 2000 WL 420698, at *4 (6th Cir. Apr. 13, 2000) (cited pursuant to 6th Cir. Rule 32.1(a)) ("Because Plaintiff Farmer has been an employee of [the defendant] since June 1975, … the application of the six factors in this case is inapposite. Rather, we conclude that the four factor test set forth in the regulations administered by the Department of Labor should have been used because the four factor test pertains to training in the employment context.") (internal citation omitted).

The record as a whole, with inferences drawn in Hawkins's favor, permits the conclusion that Hawkins was an employee. It is true that certain evidentiary materials support the view that Hawkins was a trainee at the time she participated in the introduction class on October 3–4, 2006. For example, one of the documents that Securitas gave Hawkins on September 26, 2006, stated: "The pre-assignment introduction completes your application for employment and is a

requirement that must be met before we begin training at your account. This is generic security officer training, this is not paid training. It is considered the final portion of your application/interview process." Doc. 205-2 at 2.

Other portions of the record, however, point in a different direction. As noted above, Hawkins signed a series of documents, each with a signature block reading "Employee Signature" or "Security Officer Signature," at the introduction class. Doc. 205-2 at 6-21. Moreover, the record suggests that individuals attending the class met with their branch manager or scheduler to receive their post assignment, received a photo ID, obtained and reviewed the Securitas handbook, received their Securitas uniform, received and reviewed benefit information, and began assignment training. Doc. 221 at ¶ 19. In addition, internal Securitas documents reflect Securitas's understanding that individuals attending the training/orientation class were employees. The management training manual states that "compensable work time" includes "mandatory requirements to take the ACT courses during the HEROES Hiring Process." Doc. 205-29 at 1. The PowerPoint document states that "[t]raining time" is compensable if attendance is "mandatory" and not "truly voluntary" and if the training is "Company specific," Doc. 205-24 at 1-2; the introduction class on October 3–4, 2006, met those criteria. The Securitas handbook states that "you will participate in an orientation to Securitas USA and any training required for you to perform your job duties" during "[y]our first 90 days of employment," Doc. 205-34 at 7; this suggests Securitas's belief that the training/orientation session took place during a period of "employment." In a July 2008 email, a Securitas recruiter stated that among her duties was to "[c]oordinate with orientation trainer to make sure new hires arrive on time and compete orientation," Doc. 207-9; the use of the term "new hires" reflects the

belief that the individuals participating in orientation had already been hired. This evidence makes it impossible to say for purposes of summary judgment that Hawkins indisputably was a trainee and not an employee at the time she took the introduction class on October 3–4, 2006.

Securitas next contends that it is entitled to summary judgment under 29 U.S.C. § 259 because it acted in good faith reliance on a 2004 ruling of an Illinois Department of Labor ("IDOL") administrative law judge who, according to a Securitas affidavit, orally ruled that Securitas "was not required to compensate non-employee security guard applicants for attending [Securitas's] 20-hour pre-employment training course." Doc. 176 at 13; Doc. 182 at ¶ 5. Section 259(a) provides in relevant part that "no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the [FLSA] … if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section." 29 U.S.C. § 259(a). The agency specified in subsection (b) as responsible for FLSA is the Administrator of the Wage and Hour Division of the United States Department of Labor. 29 U.S.C. § 259(b).

The 2004 IDOL ruling does not satisfy § 259 for two separate reasons. First, the ruling was not made by the Administrator of the Wage and Hour Division of the United States Department of Labor. *See Berg v. Newman*, 982 F.2d 500, 504 (Fed. Cir. 1992) (rejecting a good faith defense based on Officer of Personnel Management regulations, explaining that "Section 259 protects only those employers who rely on regulations promulgated by the Administrator of the Wage and Hour Division of the Department of Labor") (internal quotation

marks omitted).  Second, the IDOL ruling was made orally, Doc. 182 at ¶ 5, and not in writing, as the statutory text requires.  *See* 29 U.S.C. § 259(a) (referring to a "written … order, ruling, approval, or interpretation"); *see also* 29 C.F.R. § 790.13(a) (providing that § 259(a) applies only if the ruling "is in writing"); *Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 930 (11th Cir. 1987) ("in order to qualify for the good faith defense of section 259 the statute's requirement that the agency interpretation be in writing must be obeyed"); *McLean v. Garage Mgmt. Corp.*, 819 F. Supp. 2d 332, 337 (S.D.N.Y. 2011) ("An oral statement … does not, as a matter of law, constitute an administrative practice or enforcement policy for purposes of [§ 259(a)].");  *Soler v. G & U, Inc.*, 1985 WL 1695, at *9 (S.D.N.Y. June 19, 1985) (same).

Finally, Securitas asserts that "partial summary judgment should be granted under 29 U.S.C. § 255 and § 260 because there is no dispute that [Securitas] did not act willfully and did act in good faith."  Doc. 176 at 13.  Section 255 provides that the statute of limitations for FLSA claims is two years, except that a three-year limitations period applies if the violation is "willful."  29 U.S.C. § 255(a); *see Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir. 1993). Section 260 provides that a FLSA plaintiff is entitled to liquidated damages in addition to unpaid wages, but that the court may decline to award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260; *see Bankston v. State of Ill.*, 60 F.3d 1249, 1254 (7th Cir. 1995).

Whether a defendant acted willfully or in good faith generally is a question for the factfinder.  *See Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007) ("as a general rule, a party's state of mind … is a question of fact for the factfinder, to be determined

after trial") (internal quotation marks omitted); *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998) ("Whether conduct is willful … is ultimately a question of fact for the jury."); *Dep't of Transp. ex rel. People v. 151 Interstate Road Corp.*, 810 N.E.2d 1, 11 (Ill. 2004) ("Whether a party has acted in good faith is generally a question of fact."); *Gamorot v. Debush*, 1990 WL 304251, at *3 (N.D. Ill. May 15, 1990) ("This court finds that whether an employer acted willfully in violating the provisions of the FLSA is a question of fact, not properly resolved on a motion for summary judgment."). Securitas maintains that "[t]here is no evidence that SUSA knew that it was violating the FLSA or IMWL through its preemployment training program." Doc. 176 at 13. But as noted above, internal Securitas documents suggest that the company understood that individuals attending the training/orientation session were employees who should be paid. That evidence would permit a reasonable factfinder to conclude that Securitas acted willfully and not in good faith in failing to pay Hawkins for attending the training/orientation session on October 3–4, 2006, which in turn would result in application of the three-year statute of limitations under § 255(a) and a liquidated damages award under § 260. *See Bankston*, 60 F.3d at 1254-55 (holding that liquidated damages were properly awarded, and that the three-year limitations period was properly applied, where the employer's internal documents suggested that the challenged wage practice violated the FLSA).

### Conclusion

For the foregoing reasons, Securitas's motion for summary judgment on Hawkins's training/orientation claim under the FLSA and the IMWL is denied.

March 28, 2013

_____
United States District Judge